# EXHIBIT 1

POINT

# About My Point Agreement



*This document summarizes some of the key terms in the Point Agreement. Please initial each item, but keep in mind that the Point Agreement is the legally binding contract.*

**I understand...**

Initials — I am responsible for paying my mortgage(s), property taxes, and insurance. If I do not, I will be in default on my Point Agreement and Point may foreclose on my home.

Initials — I am not permitted to take out loans on my home whose repayment would take priority over my repayment to Point. This includes PACE or HERO loans. I must get Point's written permission before taking out any loan against my home. However, if the loan's purpose is to repay Point, I do not need permission.

Initials — Point is **not** buying part of my home today. Instead, Point is buying the right to 69.4000% of my home's future change in value. This right is called the "option."

Initials — When I am ready to repay Point, Point will determine my home's change in value by subtracting the Original Agreed Value from the Ending Agreed Value. To determine the Original Agreed Value, Point lowered the assessed value of my home by 17.00%. This is called the risk adjustment. The Original Agreed Value for my home is $277,220.00. To determine my home's Ending Agreed Value, Point will use my home's sale price, a final appraisal, or AVM (except in some cases of default).

Initials — My repayment amount will be the **lesser** of two amounts. The first amount is the sum of the funds I receive from Point plus Point's share of my home's change in value. The second amount is the result of applying an annual rate to the funds I receive from Point. This rate is called the Point Proceeds Cap and protects me in case my home greatly increases in value. I can use the Cost Estimator that came with my offer to estimate my repayment amount.

Initials — If my home value increases, my repayment amount will also increase. Even if my home value does not increase, my repayment amount may increase over time. This is because the Original Agreed Value is less than my home's current assessed value.

Initials — I must repay Point within 30 years. Homeowners usually repay Point by selling their home, refinancing their mortgage, or taking out a new home equity loan. The repayment is a one-time paid-in-full event. Point does not accept partial payments.

Initials — If I repay Point by selling my home, I must pay all costs associated with the sale. At that time, I must pay off my mortgage and any other liens.

Initials — Lenders may not be willing to refinance my mortgage unless I also repay Point.

POINT

# About My Point Agreement



*This document summarizes some of the key terms in the Point Agreement. Please initial each item, but keep in mind that the Point Agreement is the legally binding contract.*

**I understand...**

Initials — I am responsible for paying my mortgage(s), property taxes, and insurance. If I do not, I will be in default on my Point Agreement and Point may foreclose on my home.

Initials — I am not permitted to take out loans on my home whose repayment would take priority over my repayment to Point. This includes PACE or HERO loans. I must get Point's written permission before taking out any loan against my home. However, if the loan's purpose is to repay Point, I do not need permission.

Initials — Point is **not** buying part of my home today. Instead, Point is buying the right to 69.4000% of my home's future change in value. This right is called the "option."

Initials — When I am ready to repay Point, Point will determine my home's change in value by subtracting the Original Agreed Value from the Ending Agreed Value. To determine the Original Agreed Value, Point lowered the assessed value of my home by 17.00%. This is called the risk adjustment. The Original Agreed Value for my home is $277,220.00. To determine my home's Ending Agreed Value, Point will use my home's sale price, a final appraisal, or AVM (except in some cases of default).

Initials — My repayment amount will be the **lesser** of two amounts. The first amount is the sum of the funds I receive from Point plus Point's share of my home's change in value. The second amount is the result of applying an annual rate to the funds I receive from Point. This rate is called the Point Proceeds Cap and protects me in case my home greatly increases in value. I can use the Cost Estimator that came with my offer to estimate my repayment amount.

Initials — If my home value increases, my repayment amount will also increase. Even if my home value does not increase, my repayment amount may increase over time. This is because the Original Agreed Value is less than my home's current assessed value.

Initials — I must repay Point within 30 years. Homeowners usually repay Point by selling their home, refinancing their mortgage, or taking out a new home equity loan. The repayment is a one-time paid-in-full event. Point does not accept partial payments.

Initials — If I repay Point by selling my home, I must pay all costs associated with the sale. At that time, I must pay off my mortgage and any other liens.

Initials — Lenders may not be willing to refinance my mortgage unless I also repay Point.

Option Agreement ID: 2022223-IVEVU

# POINT DIGITAL FINANCE OPTION PURCHASE AGREEMENT

This Point Digital Finance Option Purchase Agreement is entered into as of July 28, 2022 (**"Effective Date"**), by and between Tamara M. Katzenberger and Point Digital Finance, Inc., a Delaware corporation. **"We"**, **"us"**, **"our"** and **"Point"** refer to Point Digital Finance, Inc. and its successors and assigns. **"You"**, **"your"** and **"Owner"** refer to Tamara M. Katzenberger and Owner's permitted assigns under this Agreement. Capitalized terms used but not defined in the text of this Agreement have the meanings set forth in the attached Appendix A.

## Section One:
## Option Terms

1.1 **Grant of Option and Consideration.** You agree to sell to us an exclusive and irrevocable option (the **"Option"**) to purchase an undivided percentage interest of fee simple title ownership (the **"Option Percentage"**) in and to the Property in exchange for our agreement to pay you the Option Investment Payment. Point may exercise the Option and purchase the Option Percentage by paying you the Exercise Payment. The Property is commonly known as 3130 MEADOW LN, GRAND JUNCTION, CO 81504 and is more specifically described on Schedule 1 (the **"Property"**).

You hereby agree to the specific terms of our Option as set forth below in the column entitled "Owner's Information":

| | **Definition** | **Owner's Information** |
|---|---|---|
| **Option Investment Payment** | the first payment of the Option Consideration, to be paid shortly after execution of this Agreement | $74,000.00 |
| **Option Percentage** | the percentage interest of Appreciation that Point shares in; also the percentage interest of the Property that we would acquire upon Option Exercise | 69.4000% |
| **Original Agreed Value** | the starting value of the Property for calculating Appreciation and Point Proceeds | $277,220.00 |
| **Point Proceeds Cap Factor** | the factor used to determine the Point Proceeds Cap which limits the Point Proceeds | 17.50% |
| **Exercise Payment** | the payment Point will make to you if Point exercises the Option | $118,390.68 |
| **Option Consideration** | the total purchase price for the Option Percentage, which is the sum of the Option Investment Payment and the Exercise Payment | $192,390.68 |
| **Amount of Acknowledged Pre-Existing Loans** | Acknowledged Pre-Existing Loan is defined in Appendix A | $146,637.28 |
| **Expiration Date** | the date on which the Option Term expires | July 28, 2052 |
| **Legal Form of Ownership of Property** | -- | their heirs and assigns |
| **Owner Occupied Property vs. Non-Owner Occupied Property** | both terms are defined in Appendix A | Owner Occupied Property |



© 2022 Point Digital Finance, Inc. 

| | | |
|---|---|---|
| **Property Type** | -- | Single Family Home in PUD, PUD Rider Attached |

1.2 **Term of Option and Term of Agreement.** The term of the Option you grant to us (the **"Option Term"**) will commence on the Effective Date and will expire at 11:59 p.m., Pacific Time, on the Expiration Date, unless otherwise extended pursuant to Sections 2.2.1 or 7.9. The term of this Agreement will continue until the receipt of the full amount of our Point Proceeds following (i) an Owner Option Repurchase or (ii) an Option Exercise. Certain obligations and provisions of this Agreement shall survive termination as provided in Section 7.8.

1.3 **Payment of Option Consideration.** We will pay you the total Option Consideration in two parts as set forth below.

1.3.1 **Payment of the Option Investment Payment and Option Grant Closing.** We shall pay you the Option Investment Payment within five Business Days of confirmation by an Escrow Agent that the escrow for the granting of the Option has closed including, but not limited to, confirmation of the following (the **"Option Grant Closing"**):

(a) You have executed and delivered to the Escrow Agent each of the following Option Documents: (i) a signed original of this Agreement; (ii) a signed and notarized original of the Security Instrument; and (iii) any other required documents;

(b) the Security Instrument and any other required documents are properly recorded in the appropriate state or county recorder's office; and

(c) Point has been added as an additional named insured under your insurance policies in compliance with Section 4.1.1.

1.3.2 **Payment of the Exercise Payment.** If you choose to repurchase the Option, Point will calculate the Point Proceeds and account for the Exercise Payment according to Schedule 2. If Point exercises the Option, Point will credit the Exercise Payment against its share of proceeds from a Property Sale except as indicated in Section 2.3.

1.4 **Payment of Point Proceeds.** Except as otherwise noted, your obligations under this Agreement will cease once you pay us our Point Proceeds, which will always be calculated per Schedule 2. This will typically occur by (a) your election to terminate and repurchase the Option by paying us the Point Proceeds (an **"Owner Option Repurchase"**), or (b) our election to exercise the Option upon the events specified in Section 1.4.2 event and be paid the Point Proceeds in a Property Sale. The Calculation of the Point Proceeds takes into account a cap (the **"Point Proceeds Cap"**) that may limit the amount of Point Proceeds you are obligated to pay to Point. The Point Proceeds Cap is based, in part, on the length of time that has elapsed between the Effective Date and the date Point receives the Point Proceeds.

1.4.1 **Owner Option Repurchase.** At any time during the Option Term, you may elect to repurchase and thereby terminate the Option by paying us the Point Proceeds. To initiate an Owner Option Repurchase, you must deliver written notice to us at least 15 days prior to the proposed closing date. You may be required to provide additional notice if you are repurchasing the Option in connection with a Property Sale or at the Expiration Date. The closing of the Owner Option Repurchase will be scheduled to allow us to conduct an Appraisal, at your cost, to determine the Ending Agreed Value.



© 2022 Point Digital Finance, Inc.



POINT

We shall retain the right to reject any tender by you of the Point Proceeds that is less than the full amount of the Point Proceeds, is less than $0, is not actually received by Point or is not tendered within the time frame agreed to by you and Point, or is in violation of applicable law. Upon our acceptance of the Point Proceeds, the Option shall terminate.

1.4.2 **Option Exercise Triggers.** At any time prior to you consummating an Owner Option Repurchase, we have the right to exercise the Option upon the following events: (a) any Transfer of the Property or any portion of the Property as provided in Section 2.1; (b) at the Expiration Date, as provided in Section 2.2; (c) upon an Event of Default as provided in Section 2.3; or (d) upon special circumstances as provided in Sections 4.4 and 4.5.

1.5 **Recording and Securing the Option.** You grant us the right to secure your performance under the Agreement and our right to our Option Percentage through a Security Instrument (a Deed of Trust or Mortgage), substantially in the form attached as Exhibit A (the **"Security Instrument"**), which will be properly recorded or filed. You also grant us the right to record public notice of the Option either through (a) a rider or other means of incorporation into the Security Instrument or (b) a separately recorded memorandum evidencing: (i) the provisions of this Agreement that constitute covenants running with the land and (ii) the terms of this Agreement (**"Notice of Option Purchase Agreement"**).

## Section Two:
## Owner Option Repurchase and Option Exercise

2.1 **Owner Option Repurchase or Point Option Exercise Upon a Sale.** In connection with any Property Sale you may elect to terminate and repurchase the Option. If you do not elect to repurchase the Option, then we shall have the right, but not the obligation, to exercise the Option and be paid our Point Proceeds (**"Option Exercise Upon a Sale"**).

2.1.1 **Permitted Sale.** Any Property Sale by you, whether in connection with an Owner Option Repurchase or our Option Exercise, must meet the following conditions (a **"Permitted Sale"**): (a) you must use a licensed real estate agent to market and sell the Property; (b) you must hold at least two open houses; (c) the home must be listed for sale on the Multiple Listing Service for at least 14 days; (d) the sale must be an Arm's Length Transaction; (e) you will be solely responsible for conveying title free and clear of any liens to the satisfaction of the Third Party Buyer, and for satisfying any and all loans and other obligations secured by liens on the Property; (f) the transfer of the title to the Property at the closing of a Property Sale to a Third Party Buyer must convey the Property without being subject to the Option or any of the Option Documents; and (g) the Property Sale and transfer of the title to the Property may not be defeasible by you or the Third Party Buyer after close of Escrow upon the occurrence of some future contractually-specified event. A Permitted Sale includes a Property Sale that is not in accordance with this Section 2.1 but is otherwise expressly consented to in writing by Point. If you do not comply with all requirements, Point may order an Appraisal at your cost and use the Appraised Value of the Property rather than the sale price to calculate Point Proceeds.

2.1.2 **Notices and Documentation Upon Proposed Property Sale.**

(a) Owner Notice of Intention to Sell. You must give us prompt written notification, but no later than when you list the home for sale or, if the Property will be sold off the market, then at the time that you know you intend to sell.



© 2022 Point Digital Finance, Inc.



POINT

(b) Owner Notice of Acceptance of Offer. If you accept an offer to purchase the Property, you must give us immediate, written notification but in no event more than 5 days after your acceptance of such offer and at least 15 days prior to a closing of any such transaction.

(c) Owner Notice Requirements. When you provide your notice of intent to sell or accept an offer, you must (a) indicate whether you elect to make an Owner Option Repurchase, or acknowledge we may make an Option Exercise in connection with the Property Sale; (b) include all related documents and agreements executed, created, obtained or delivered by you in connection with the marketing or sale of the Property; and (c) disclose whether the Property has been a Non-Owner Occupied Property at any time in the six-month period prior to the notice of intent to sell.

(d) Point Notice of Option Exercise Upon a Sale. If your notice of intent to sell or accept an offer does not indicate that you will make an Owner Option Repurchase, within five Business Days of our receipt, we may deliver a written notice to you informing you of our intent to commence our Option Exercise Upon a Sale (**"Notice of Option Exercise Upon a Sale"**). If you do not provide us with a notice of intent to sell or accept an offer, we will not have any obligation to deliver a Notice of Option Exercise Upon a Sale.

(e) Required Documentation. You shall promptly provide us all documents, purchase offers, escrow instructions, preliminary title reports and any other materials relating to the proposed sale or transfer as they become available.

2.1.3 **Ending Agreed Value and Appraisal in Property Sale.** Prior to closing on your Property Sale, we may order an Appraisal at your cost as provided in Section 4.3. You agree to comply with such process. In any Property Sale in connection with an Owner Option Repurchase or an Option Exercise Upon a Sale, the Ending Agreed Value is determined according to Schedule 2 Paragraph C.1.

2.1.4 **Closing of Sale and Owner Option Repurchase or Option Exercise Upon a Sale.**

(a) Escrow. Any Property Sale must be consummated through a licensed real property Escrow using the services of an Escrow Agent. Any instructions to the Escrow Agent regarding the disbursement of sales proceeds, the payment of our Point Proceeds and the release of the Security Instrument and, if applicable, the Notice of Option Purchase Agreement must have our prior written consent. Our consent will be given and conditioned upon our determination of your compliance with the terms and conditions of this Agreement.

(b) Concurrent Closings. The closing of an Owner Option Repurchase may occur prior to or concurrently with the Property Sale through the same Escrow as the Property Sale.

(c) Escrow Deliveries. On or prior to the close of Escrow upon any Property Sale where there will be an Owner Option Repurchase or Option Exercise Upon a Sale, (i) you agree to deliver or cause to be delivered to the Escrow Agent the appropriate deeds, affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to us, to effect your Owner Option Repurchase or our Option Exercise; and (ii) we agree to deliver or cause to be delivered the Exercise Payment to the Escrow Agent, or, at our election, the amount of the Exercise Payment may be debited against the Point Proceeds.

(d) Payment Allocations. At close of and through Escrow for a Property Sale, we shall be paid an amount equal to the Point Proceeds. You will be solely responsible for paying Closing Costs and Sales Commissions and satisfying and removing any and all loans and



© 2022 Point Digital Finance, Inc. 

other obligations secured by liens on the Property.

2.2 **Owner Option Repurchase or Point Option Exercise as of Expiration Date.** Prior to the Expiration Date, (a) you may elect to terminate and repurchase the Option by paying us the Point Proceeds through an Owner Option Repurchase in accordance with Section 2.2.1, or (b) if you do not consummate your Owner Option Repurchase, then we shall have the right, but not the obligation, to exercise the Option as of the Expiration Date, subject to the terms and conditions of Section 2.2.2 (**"Option Exercise as of Expiration Date"**).

2.2.1 **Owner Option Repurchase as of Expiration Date.** To initiate an Owner Option Repurchase in connection with the expiration of the Option Term, you must deliver written notice to us of your election to make an Owner Option Repurchase at least 50 days prior to the Expiration Date. The closing of the Owner Option Repurchase must occur prior to the Expiration Date and should be scheduled so as to allow us to conduct the Appraisal to determine the Ending Agreed Value for purposes of calculating the Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated prior to the Expiration Date, then (a) in Point's sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated, and (b) the Option Term shall automatically be extended by 90 days after the original Expiration Date to permit us the opportunity to make an Option Exercise as of Expiration Date.

2.2.2 **Option Exercise as of Expiration Date and Property Sale.** In the event of an Option Exercise as of Expiration Date, you will first be required to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. We will then purchase the Option Percentage of the Property by paying you the Exercise Payment, which will be held in an interest-bearing escrow account (the **"Exercise Payment Escrow Account"**). Upon closing of Escrow on the exercise of the Option, we will thereby take joint ownership of the Property with you and have the right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale subject to the procedures set forth in Section 2.2.2(d). The Exercise Payment will not be released until the closing of a subsequent Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise as of Expiration Date. You shall retain physical possession and the exclusive right to occupy the Property prior to a Property Sale (except if we determine, in our sole discretion, that there are extreme circumstances affecting the condition of the Property, such as abandonment, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(a) Notice of Option Exercise as of Expiration Date. To commence our Option Exercise as of Expiration Date, we will deliver written notice to you of our intention to exercise the Option (**"Notice of Option Exercise as of Expiration Date"**) at least 30 days prior to the Expiration Date.

(b) Documentation; Appraisals; Inspections; Confirmation of Title. Within 15 days following delivery of the Notice of Option Exercise as of Expiration Date, you agree to allow us to conduct both a home inspection and an Appraisal of the Property, at your cost, for the purpose of ascertaining the market value and the condition of the Property. Upon our request, you will also provide us with Confirmation of Title to our satisfaction, effective as of the date of closing of the Option Exercise as of Expiration Date. You will deliver to us any documents necessary to grant us the exclusive right to market and sell the Property. If we are not satisfied, in our sole discretion, with the value of the Property following the



© 2022 Point Digital Finance, Inc.

Appraisal or with the Confirmation of Title, we may withdraw our intention to exercise the Option and cancel our Notice of Option Exercise as of Expiration Date in writing, without any penalty to us or any further obligation to exercise the Option.

(c) Closing on Option Exercise as of Expiration Date.

(i) **Escrow for Option Exercise as of Expiration Date.** To effect the Option Exercise as of Expiration Date and purchase our Option Percentage of the Property, we shall open an Escrow, separate from the Exercise Payment Escrow Account. The parties shall use best efforts to close Escrow by the Expiration Date, with the Exercise Payment to be held in the Exercise Payment Escrow Account until the closing of a subsequent Property Sale.

(ii) **Closing Deliveries for Option Exercise as of Expiration Date.** On or prior to the close of Escrow upon our Option Exercise as of Expiration Date, you agree to deliver or cause to be delivered to the Escrow Agent the following: (i) a Grant Deed; (ii) Closing Costs, if any; (iii) any documents or other instruments that may be required by the Escrow Agent in connection with Confirmation of Title; (iv) the appropriate affidavits, certificates or notices as may be required by federal or state law, in form satisfactory to Point; (v) any documents necessary for Point to conduct a Property Sale following Option Exercise; and (vi) instructions to the Escrow Agent that the Exercise Payment be deposited and held in an interest bearing Exercise Payment Escrow Account pending the closing of a Property Sale. We agree to deliver or cause to be delivered to the Escrow Agent (a) a preliminary change of ownership report (or similar document) required under applicable state or local law, and (b) the Exercise Payment which will be deposited in the Exercise Payment Escrow Account, less all monetary amounts owed to Point in the form of unpaid Service Fees and unreimbursed Preservation Payments.

(d) Property Sale in Connection with Option Exercise as of Expiration Date.

(i) **Initiation of Property Sale by Owner.** If you intend to initiate a Property Sale following our initiation of Option Exercise as of Expiration Date, you must meet the Owner obligations upon a Property Sale, and the sale must meet the conditions for a Permitted Sale, as described in Section 2.1.

(ii) **Initiation of Property Sale by Point.** If we choose to initiate a Property Sale after or in conjunction with our Option Exercise as of Expiration Date, we shall provide you with 10 Business Days advance notice of our intention to solicit buyers and sell the Property to one or more third parties in a Property Sale. You shall cooperate by allowing access to the Property and promptly executing all documents reasonably presented to you by us to effect a transfer of your interest in the Property to the Third Party Buyer.

(iii) **Ending Agreed Value and Payment of Proceeds.** In any Property Sale following our Option Exercise as of Expiration Date, the Ending Agreed Value shall be as determined by Schedule 2 Paragraph C.1. At close of and through the Escrow for the Property Sale by us under this Section 2.2.2(d), the Escrow shall be conducted and sale proceeds shall be allocated and paid in the manner described in Section 2.1, except that the amount in the Exercise Payment Escrow Account shall be released to you and we shall also be paid (i) any Closing Costs that we pre-paid; and (ii) any other commercially reasonable sums expended by us in good faith in the preparation



© 2022 Point Digital Finance, Inc.

and marketing of the Property for sale.

2.3 **Option Exercise After Default and Property Sale.** At any time during the term of this Agreement, upon the occurrence of any Event(s) of Default described in Section 6.1 below, we shall have the right, but not the obligation, to exercise the Option (an "**Option Exercise After Default**") pursuant to the terms of this Section 2.3 and purchase the Option Percentage of the Property by paying you the Exercise Payment which will be held in a separate Exercise Payment Escrow Account. We may then require you to fully cooperate and execute all documents necessary to grant us the exclusive right to market and sell the Property. Following the closing of escrow on Option Exercise After Default, we will thereby take joint ownership of the Property with you and have the exclusive right to solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale. The legal form of joint ownership will be decided by us, in our sole discretion, at the time of Option Exercise After Default. Prior to a Property Sale, you shall retain physical possession and the exclusive right to occupy the Property (except if we determine, in our sole discretion, that the Property is at risk of waste or gross neglect, in which case we shall have discretionary rights of entry or possession solely in order to preserve and maintain the Property). At any time from an occurrence of any Event of Default until the cure of such default to our sole satisfaction, we may order one or more Appraisals.

2.3.1 **Notice of Option Exercise After Default.** Upon the occurrence of any Event(s) of Default giving rise to our right to exercise the Option, we shall provide written notice to you of the default and your right to cure (the "**Notice of Right to Cure Default**"). In the event that you fail to cure the default, as determined in our sole discretion, within 30 days following delivery of Notice of Right to Cure Default, we may, but are not obligated to, declare a default and our election to exercise the Option by delivering to you a written Notice of Option Exercise After Default (the "**Notice of Option Exercise After Default**"). Upon delivery of the Notice of Option Exercise After Default, we shall automatically be permitted to commence the process to exercise the Option and close on the Option Exercise, without further notice to you, pursuant to those terms and conditions set forth for Option Exercise as of Expiration Date in Sections 2.2.2(b) - (d) above; except that we shall additionally deliver instructions to the Escrow Agent, in form and content acceptable to us, concerning disbursement of the funds in the Exercise Payment Escrow Account to remedy the Events of Default in accordance with Section 2.3.3 below. We may, but are not obligated to, record the Notice of Option Exercise After Default in the county where the Property is located.

2.3.2 **Owner Cure or Failure to Cure After Notice.** In the event we deliver you a Notice of Option Exercise After Default, you shall retain the right to cure such default, with Point to determine the sufficiency of such cure in its sole discretion, on or before the 90th day following delivery of such Notice. In the event you fail to timely or sufficiently cure the default, as determined in our sole discretion, we shall notify you of the date we have selected for close of Escrow on our Option Exercise After Default; provided, however, that close of Escrow may not occur until the 120th day following delivery of the Notice of Option Exercise After Default, at the earliest.

2.3.3 **Amounts Chargeable to Owner After Default.** You authorize us to pay all amounts necessary to any third parties to enable us to cure and remedy your Event of Default by either (a) prior to Option Exercise, reducing the Exercise Payment that is owed to you through the Escrow for our Option Exercise After Default or (b) following Option Exercise, making disbursements from the Exercise Payment Escrow Account as described in Section 2.3.1. To cure and remedy the default, we may make payments to cover your delinquent payments, accrued interest, late fees, reinstatement fees, taxes and other penalties, together with any and



© 2022 Point Digital Finance, Inc.

all amounts which we deem necessary, in our discretion, to repair, protect and maintain the Property. Additionally, Point may charge you reasonable administrative fees for our oversight of the default process.

2.3.4 **Property Sale Following Option Exercise After Default.** Any Property Sale initiated by you or Point following Point's Option Exercise After Default must be conducted in accordance with the terms and conditions of Section 2.2.2(d), provided that, the Ending Agreed Value shall be determined according to Schedule 2 Paragraph C.2.

2.3.5 **Concurrent Remedies.** Our right of Option Exercise After Default under this Section 2.3 shall be, to the extent permissible under law, concurrent with our other rights and remedies at law and in equity, including, without limitation, remedies specified in Section 6 below. We retain full discretion to select the appropriate remedy following default, and are not obligated to initiate Option Exercise prior to initiating foreclosure proceedings.

2.3.6 **Owner Option Repurchase After Default.** At any time following our delivery of a Notice of Right to Cure Default but prior to the consummation of our Option Exercise After Default, you may elect to terminate and repurchase the Option by paying us our Point Proceeds in an Owner Option Repurchase as provided in Section 1.4.1; provided that the closing of such Owner Option Repurchase must (a) occur (i) within 20 days of you providing us notice of your election to make the Owner Option Repurchase, and (ii) prior to any scheduled closing of an Option Exercise After Default; and (b) use an Ending Agreed Value determined according to Schedule 2 Paragraph C.2 to determine the amount of Point Proceeds. If you elect to make an Owner Option Repurchase but the closing of the Owner Option Repurchase is not consummated within the prescribed periods in this Section 2.3.6, then (a) in our sole discretion, your right to make an Owner Option Repurchase may thereafter be terminated; (b) any waiting periods for us to be allowed to exercise of our remedies shall not be impacted; and (c) if we had delayed any exercise of our remedies because of your election, such delay shall not limit any of our rights to such remedies.

## Section Three: Terminations

3.1 **Non-Exercise; Other Terminations of Option.** Subject to the continuing duties, rights and obligations of the parties under Section 5 (Representations and Warranties) and Section 6 (Default and Remedies for Default), the Option shall terminate under the following conditions if there has not been a prior Owner Option Repurchase or Option Exercise:

(a) upon a Property Sale for which Point receives notice of intention to sell or acceptance of an offer, as provided in Section 2.1.2, and Point elects not to exercise the Option, provided such Property Sale would have otherwise met the conditions for a Permitted Sale;

(b) Point elects not to exercise the Option, and allows it to lapse, as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of the sale of the Property are paid to Point in the full amount specified in Section 4.4.2;

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to Point in the full amount specified in Section 4.5; or



© 2022 Point Digital Finance, Inc. 

(e) Point voluntarily terminates the Option Documents in writing.

3.2 **Effect of Non-Exercise and Termination.** If the Option is terminated as provided in Section 3.1 above, then (a) the Option and our rights to exercise the Option shall immediately terminate without notice; (b) the Option Investment Payment paid to you by us shall be retained by you in consideration of the granting of the Option; and (c) subject to any survival provisions, this Agreement and the other Option Documents shall terminate.

3.3 **Termination Following Exercise.** In the event of an Option Exercise, this Agreement shall continue in full force and effect, as provided in Section 1.2, and terminate following the consummation of a Property Sale, or other event, where we receive the full amount of our Point Proceeds; provided, however, that certain obligations and provisions of this Agreement shall survive such termination as provided in Section 7.8.

3.4 **Release after Termination.** Point will file or will cause to be filed a termination and release of the Notice of Option Purchase Agreement, if applicable, and a reconveyance or satisfaction of the Security Instrument after the Option terminates.

## Section Four:
## Additional Covenants of Owner and Point

4.1 **Covenants and Rights of Owner.**

4.1.1 **Insurance.** You shall maintain at your own expense, and at a level that will cover the cost of replacement of the Property plus improvements, insurance on the Property against fire and other hazards with only those exclusions customarily associated with special form policies, and exceptions to those exclusions for ensuing loss. In addition, Point may from time to time reasonably require by written notice that you obtain and maintain (a) insurance against any other hazards, such as flood hazards or earthquakes, which insurance is common for similar properties in similar locations, and (b) liability insurance on the Property against such risks and in such amounts as are reasonable for similar properties in similar locations. Any such required insurance shall be obtained from a nationally recognized provider. We shall be named as an additional named insured and/or loss payee (or as we otherwise direct) under all hazard and liability insurance policies obtained by you, whether or not such insurance is required under this Agreement. You expressly authorize us to communicate directly with all such insurance companies for the purposes of ensuring the maintenance of such insurance policies and the coverage and reimbursement of losses thereunder. If you fail to maintain or obtain the insurance coverage required by this Section 4.1.1, we may obtain coverage on the Property that we, in our sole discretion, deem necessary and appropriate to protect our Point Proceeds as a Preservation Payment.

4.1.2 **No Receiver.** You shall not permit the appointment of a receiver for the Property. If a receiver for the Property is appointed, we may, but are not obligated to, take such action as we in our sole discretion may deem necessary or appropriate to remove such receiver, at your expense.

4.1.3 **Rental Premium.** You shall provide us with prompt written Notice in the event the Property becomes a Non-Owner Occupied Property at any time after the Effective Date. If the Property becomes a Non-Owner Occupied Property at any time within the six-month period prior to a Property Sale or prior to an Appraisal of the Property done for purposes of calculating the Point Proceeds, then you shall pay us the Rental Premium, which will be added to the Point



© 2022 Point Digital Finance, Inc.

Proceeds. The Rental Premium will not be assessed if (i) the Property is identified as a Non-Owner Occupied Property as of the Effective Date and as indicated in Section 1.1 or (ii) in the event the Ending Agreed Value is less than the Original Agreed Value. Without limiting the foregoing, a Property may not be subject to a rental or lease period that extends beyond the Expiration Date without Point's prior written consent.

4.1.4 **Service Fees.** You shall pay all Service Fees imposed by us from time to time in accordance with this Agreement. Service Fees shall include, without limitation: (a) reasonable fees for processing your requests for subordination; (b) reasonable fees for processing your requests for Property title or ownership changes; (c) reasonable fees for processing any reconveyance or renewal recordings of our Option Documents; (d) reasonable fees for processing Preservation Payments; (e) reasonable fees relating to a default by you, including administrative fees for our oversight of the default process; and (f) charges to cover any third party or other out-of-pocket costs relating to any of the foregoing categories (including, for example, charges imposed by title companies and Escrow companies, recording of documents, and reasonable attorneys' fees).

4.1.5 **Existing Loans.** Without our express written approval, you shall not increase, or permit the increase of (whether through negative amortization or otherwise), any existing loans secured by liens on the Property.

4.1.6 **Liens and Secured Obligations.** You shall at all times pay and keep current any and all loans and obligations secured by liens on the Property. You shall not encumber the Property with any secured obligation that is either senior to or could have the effect of impairing Point's lien position.

4.1.7 **Occupancy.** You shall enjoy sole right of occupancy of the Property as an owner and not as a tenant or lessee, whether or not we have exercised the Option, subject to the rights of you and Point to sell the Property pursuant to the terms of this Agreement. The foregoing sole right of occupancy shall be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your right of sole occupancy is not transferable by you except as part of a Property Sale or Exempted Owner Property Transfer, or as otherwise permitted by us in our sole discretion.

4.1.8 **Tax Benefits.** You shall be entitled to the full benefit of any and all tax advantages arising in relation to the Property, including, without limitation, all available deductions for taxes paid by you; provided, however, that you shall not be entitled to any tax benefits arising out of or attributable to any unreimbursed Preservation Payment.

4.1.9 **Obligation to Provide Information to Point.** Upon our reasonable request, you shall answer questions regarding the status of the Property and provide to us such reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage and information available to you concerning the Property and any modifications to the Property. You or your representative shall immediately provide Point with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, or Point's ability to exercise any right conferred by any of the Option Documents, including, without limitation, (a) the death or divorce of any Owner, (b) the death of any Trustee or Trustor (where Owner is/are the Trustee(s) of a Revocable Trust), or (c) the occurrence of an Event of Default.

4.1.10 **Debt Payoff.** A portion of the Option Investment Payment may be paid to settle and discharge your debts and outstanding amounts owed to third party creditors (the "Debt



© 2022 Point Digital Finance, Inc. 

Payoff"). Point and Owner will instruct the Escrow Agent handling the Option Grant Closing to make disbursements for the Debt Payoff. Point and Owner agree that the Debt Payoff Amount represents the amounts due to the creditors and the Debt Payoff Amounts specified in the Option Agreement Estimate and Closing Disclosure are estimates based on the best information we have prior to the Option Grant Closing. You agree that the daily amounts of each debt may fluctuate and that Point may change the final amounts paid to each creditor to best accomplish the parties' intent. These amounts may increase due to accrual of interest between the Effective Date and the date funds are disbursed through escrow. These amounts may also decrease due to payments that You made prior to the Option Grant Closing. Point and Owner agree that the actual amount to be paid through escrow to Owner's creditors will include all interest accrued and due as of the date of the Option Grant Closing and may be an amount greater or lesser than the estimated Debt Payoff Amount indicated on the Closing Disclosure. Any amounts due to creditors in excess of the estimated Debt Payoff Amount will be deducted from the remaining Option Investment Payment due to Owner. Any changes made to the Debt Payoff will not affect the amount of the Option Investment Payment.

We will send you written confirmation of the exact amounts paid pursuant to the Debt Payoff following the Option Grant Closing. Within ten days of receiving payment of the Option Investment Payment following the Option Grant Closing, you will initiate payments in accordance with the terms of this Agreement to those third party creditors who were not paid through Escrow in connection with the Option Grant Closing; within 45 days of the Option Grant Closing, you will provide Point with written evidence from your bank or the third party creditors of payments made pursuant to this Section 4.1.10.

4.2 **Covenants and Rights of Point.**

4.2.1 **Point's Interest in the Property.** Until the time you consummate an Owner Option Repurchase or Point closes on the Option Exercise, Point has a contingent ownership interest in the Property. Following the closing of the Option Exercise, Point will have joint ownership rights in the Property.

4.2.2 **Preservation Payments.** To the extent that you fail to take action to protect the Property and Point's Rights as required under this Agreement, we shall have the right in our sole discretion to take such action and pay such money as we deem appropriate to correct your failure to take such required action (**"Preservation Payments"**). We shall give you five Business Days written notice of your failure prior to our taking corrective action. You shall promptly, upon demand for payment, but not later than 10 Business Days after demand, pay or reimburse us for any and all Preservation Payments, including, without limitation, those related to: the placement of insurance, the payment of taxes, expenses to remove or prevent a receiver for Property or the cure of defaulted loans. Point shall be entitled to charge you an interest rate of 8% per annum (or less if limited by applicable law) on any Preservation Payments it makes. Interest will begin to accrue on the date Point makes the Preservation Payment and will continue to accrue until Point is repaid or receives its Point Proceeds.

4.2.3 **Waiver of Right to Partition.** Owner and Point each hereby waive and relinquish all rights either of them may now or hereafter have to seek partition of the Property, whether in kind or by sale; provided, however, that Point shall retain the right to seek a partition: (a) in the event of, and as part of any action arising out of an Event of Default which is not timely cured pursuant to Section 2.3 above; or (b) in connection with any claim or action by Owner which asserts in whole or in part that this Agreement or any portion hereof is against the law or otherwise unenforceable.



© 2022 Point Digital Finance, Inc. 

4.2.4 **Right to Disclose Certain Information.** We may share certain personal and financial information with regard to this Agreement with our affiliates, subsidiaries, assignees and persons with which we intend to conduct business, including, without limitation, the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement.

4.2.5 **No Point Liability and No Point Loans.** Point shall not be liable for (including liability to repay) any loans created or obtained by you whether before or after any exercise of the Option and whether or not consented to, approved of, or subordinated to by Point. Further, we shall have no liability for homeowner association fees, property taxes, homeowner or property insurance or other liabilities or obligations that might arise in connection with the Property.

4.3 **Appraisals.**

4.3.1 **Appraisal Order.** In the event of (a) a proposed Property Sale; (b) a proposed Owner Option Repurchase; (c) a determination of Ending Agreed Value as of the Expiration Date; (d) any allocation of insurance proceeds; (e) an Event of Default (at any time and on more than one occasion until the cure of such default or until an Owner Option Repurchase or a Property Sale following an Option Exercise After Default); or (f) any determination of Liquidated Damages pursuant to Section 8 of the Security Instrument, we may, in our sole discretion, (i) order an appraisal; (ii) order a broker's price opinion; (iii) order an underwriting-grade automated valuation model; or (iv) conduct any other reasonable valuation method to determine the value of the Property (collectively, an **"Appraisal"**). Subject to this Section 4.3, the value reflected on the Appraisal shall be the **"Appraised Value"** of the Property.

4.3.2 **Owner Cooperation.** You will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any and all relevant documentation in your possession pertaining to conditions that may affect the value of the Property. In addition, upon any Appraisal, you will inform us if the Property has been a Non-Owner Occupied Property in the six-month period prior to the Appraisal and, if currently a Non-Owner Occupied Property or anticipated to be a Non-Owner Occupied Property, the current rental or lease term, and any renewal rights, for the tenant.

4.3.3 **Additional Appraisals.** Subject to this Section 4.3.3, either Owner or Point may elect to order second and third Appraisals when an Appraised Value is needed under this Agreement. If either party desires to have a second Appraisal, then (a) the second Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the first Appraisal, and (b) the Appraised Value will then be the average value of the two Appraisals. If either party desires to have a third Appraisal, then (i) the third Appraisal must be completed (not just requested or ordered) within 30 days after receiving final results of the second Appraisal, and (ii) the Appraised Value will then be the median value of the three Appraisals.

4.3.4 **Cost of Appraisal.** You shall pay all expenses associated with the first Appraisal on the Property ordered in connection with any event described in Section 4.3.1. The party that orders an additional Appraisal in connection with Section 4.3.3, if any, shall pay all expenses associated with such additional Appraisal. If you fail to pay the expenses associated with the first Appraisal or any additional Appraisal you request, we may subtract such expenses, or direct the payment of such expenses, out of Escrow.

4.4 **Property Destruction or Damage; Insurance.**



© 2022 Point Digital Finance, Inc.

4.4.1 **Repair and Restoration.** If the Property is destroyed or damaged in any material manner, you shall restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding such destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with Senior Liens on the Property, you shall apply any and all insurance proceeds (whether or not the underlying insurance was required by us) to such restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you shall be responsible for any shortfall and we shall have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

4.4.2 **Allocation Where Repair Not Feasible.** If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you shall obtain an Appraisal, provided that the appraiser shall be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any and all insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (a) to payment (or reimbursement) of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by us) reasonably incurred by you, a senior lender and/or Point in collecting and contesting with the insurers the payments under the relevant insurance policies; (b) to payment of all Senior Loans, provided that, if the insurance proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens; (c) to us, an amount calculated according to the Calculation of Point Proceeds; and (d) to you, the balance of the proceeds.

4.4.3 **Failure to Maintain Adequate Insurance.** If (a) you fail to maintain insurance in amounts required by Section 4.1.1 above or any insurance claim is denied due to your action or inaction, and (b) the insurance proceeds from any loss are not sufficient to pay to us the entire amount owed as set forth in Section 4.4.2 above, then there shall be an Exercise Payment Insurance Reduction proportional to the decrease in the Property's value as compared to the Appraised Value of the Property immediately prior to the destruction or damage. In this case, we may exercise the Option (if we have not already done so) and sell the Property in its then-current state according to the procedure set forth in Section 2.3 above, except that the Exercise Payment shall be reduced because of the added economic burden and risk imposed on Point by virtue of your failure. The Exercise Payment Insurance Reduction shall be taken into account in the calculation of the amount due to us according to the Calculation of Point Proceeds. The proceeds of any sale pursuant to this Section 4.4.3, together with any and all available proceeds from any and all insurance policies (whether or not the underlying insurance was required by us), will be allocated as described in Section 4.4.2 above.

4.5 **Condemnation.** If the Property is condemned in whole or in part and the Option has been exercised, then all condemnation proceeds net of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by Point) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds (**"Net Condemnation Proceeds"**) shall be allocated as provided in Section 4.4.2(b) – (d) above. If the Property is condemned in part, and if the Option has not been exercised, then we will have the right to exercise the Option, calculating our Point Proceeds using the Net Condemnation Proceeds as the Ending Agreed Value. The proceeds shall be allocated as provided in Section 4.4.2(b) – (d) above. In the case of a partial condemnation, Point's Rights shall be retained with respect to any portion of the Property that has not been condemned.



© 2022 Point Digital Finance, Inc.

## Section Five:
## Representations And Warranties

5.1 **In General.** The Owner makes the representations and warranties in this Section 5 to, and for the benefit of, Point. The representations and warranties of Owner in this Section 5 shall be deemed made and renewed on and as of: (a) the Effective Date; (b) if you effect an Owner Option Repurchase, the date the repurchase is consummated; (c) if the Option is exercised, the date the exercise is consummated; and (d) upon any permitted assignment by you. The truth, accuracy and completeness of the representations, warranties and covenants set forth in this Section 5 at and as of each date in (a) – (d) above are a condition precedent to any and all of our obligations under each of the Option Documents.

5.2 **Capacity; Authority.** You represent and warrant that you, as the Owner(s) identified above, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. Your fee simple title to the Property is marketable and insurable, free of restrictions, leases, liens and other encumbrances or interests, and except as specifically identified in the Confirmation of Title delivered to Point, except with respect to Acknowledged Pre-Existing Liens. You represent and warrant that you have the full capacity and the legal power, right and authority to grant the Option, to enter into this Agreement and the other Option Documents, and to consummate the transactions contemplated by those documents. If you are the Trustee(s) of a Revocable Trust: (a) such trust has been duly formed; (b) the Trustee(s) of such trust have the capacity and authority to enter into the Agreement and the other Option Documents; and (c) copies of all trust documents (and all amendments and supplements) have been delivered to Point.

5.3 **No Lawsuits, Claims, or Foreclosures.** There is no litigation or arbitration pending or, after your due and diligent inquiry, to the best of your knowledge, threatened against you that arises out of the ownership of the Property or that might adversely affect the Property, the value of the Property or your ability to perform your obligations under this Agreement. You have not received or are not aware of notice of any special assessment or other proceedings affecting the Property nor of any: (a) default or notice of default with respect to any loan or other obligation secured by the Property; (b) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (c) information or notice that the Property is to be sold or foreclosed upon by a party holding a lien on the Property.

5.4 **No Violations.** You have no knowledge of or information concerning any violations of any laws, regulations, zoning ordinances or other land-use regulation proceedings relating to the Property and no knowledge that any operations or activities upon, or use or occupancy of the Property, or any portion of the Property, by you or others are not, have not been or will not be in all material respects in compliance with all state, federal and local laws, zoning ordinances, and regulations.

5.5 **Environmental Matters.** You have no knowledge of or information concerning any violation of, or claim of violation of any state, federal or local environmental law or regulation, including, without limitation, those relating to hazardous materials (**"Environmental Laws"**). In addition, you have no knowledge of the presence of any hazardous materials on, in, or about the Property or property in the vicinity of the Property. You shall not, and shall not allow others to, violate any laws or regulations relating to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any Environmental Law.

5.6 **Documentation and Information Supplied by Owner; Financial Condition of Owner.** Your application to Point and all financial and other documentation and other information (including



© 2022 Point Digital Finance, Inc. 

documentation and information about the Property) supplied or made available by you or your spouse, if applicable, as part of applying for, or in connection with entering into, the Option and the Option Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's) financial condition as of (a) the date supplied, and (b) the Effective Date of this Agreement. There has been no material change in your financial condition as of the Effective Date since your application to Point.

5.7 **Conflict; Enforceability.** You represent and warrant that: (a) the execution and delivery of the Option Documents, the incurrence of the obligations set forth in those documents, the consummation of the transactions contemplated by, or compliance with the terms of, those documents, will not conflict with, or result in a breach of, any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which you are a party or by which any portion of the Property may be bound; and (b) the Option Documents and all other documents required to be executed by you in connection with those documents shall be valid, legally binding obligations of, and enforceable against, you and, if applicable, Trustor(s) and any successors or assignees in accordance with their terms.

## Section Six:
## Defaults and Remedies For Default

6.1 **Events of Default.** The occurrence of any of the following shall constitute an Event of Default (**"Event of Default"**) under the Option Documents, in Point's sole discretion:

(a) you breach or fail to perform any obligation or covenant under any of the Option Documents (including but not limited to any failure or refusal to honor Point's Rights), or reject or take any action to terminate the Option or this Agreement, except as expressly permitted under this Agreement;

(b) you fail to timely provide to us any Notice(s) required under this Agreement;

(c) you make any representation or warranty, whether oral or written, to us that is false or misleading as of the time given, including, without limitation, any misrepresentation or suppression of material fact in connection with the amount or kind of consideration given to you in any Property Sale and the representations and warranties in Section 5;

(d) any event of your insolvency, including but not limited to the commencement of any voluntary or involuntary bankruptcy proceeding by or against you or the appointment of a receiver for the Property or you or a conservator of your affairs;

(e) any taxes or assessments on the Property become delinquent;

(f) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with the provisions of this Agreement;

(g) any senior lien that does not have our prior written approval attaches to the Property;

(h) any loans that are secured by liens on the Property, whether recorded or unrecorded, become delinquent (whether or not such loans or liens have been approved or subordinated to by Point);



© 2022 Point Digital Finance, Inc.

(i) you fail to maintain, preserve or repair the Property in good repair and in a condition substantially similar to its condition on the date of this Agreement, except for normal wear and tear;

(j) insurance on the Property is not maintained as prescribed in this Agreement;

(k) any assignment, attempted assignment, or other transfer of the Option or Option Documents in violation of Section 7.7.2 below;

(l) if no Owner or no renter authorized by the Owner uses the Property as regular living and sleeping quarters for more than 730 consecutive days; provided that any non-occupancy due to renovation on the Property will not be counted against such two-year period;

(m) the Property becomes subject to a lease or rental agreement that extends beyond the Expiration Date;

(n) you fail to cooperate with us, which we will determine in our sole discretion, to effect a Property Sale before or after Option Exercise as of Expiration Date or Option Exercise After Default; or

(o) any other action or event occurs which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, Point's right to exercise the Option or Point's Rights.

6.2 **Remedies Following Event of Default.** In an Event of Default, Point may exercise any of the following remedies and any other rights and remedies available to us in law, equity or otherwise:

6.2.1 **Exercise Option and Receive Point Proceeds.** As provided in Section 2.3, upon the occurrence of any Event(s) of Default, we shall have the right, but not the obligation, (a) to exercise the Option and take joint ownership of the Property with you and (b) then solicit and to sell the entire Property, including your interest therein, to one or more third parties in a Property Sale, and receive our Point Proceeds in connection with such Property Sale.

6.2.2 **Foreclosure/Power of Sale Under State Laws.** Point shall be entitled, in its sole discretion, to exercise Point's power of sale under the Security Instrument, and to foreclose upon the Property to the extent permissible under applicable law. Point shall follow and be bound by those procedures prescribed under law for foreclosure of residential real property established in the jurisdiction where the Property is located. In the event Point elects to exercise the power of sale and foreclose on the Property under the Security Instrument and in this Section 6.2.2, Point may declare any and all of the sums specified as Liquidated Damages immediately due and payable by delivery of the notice(s) specified in the Security Instrument.

6.2.3 **Damages for Breach.** We shall be entitled, in our sole discretion, but are not obligated to, demand damages for any Event(s) of Default, calculated according to the Calculation of Point Proceeds set forth in Schedule 2.

6.2.4 **Specific Performance, Rescission and Injunctive Relief.** You and we agree that if we are not allowed to exercise our rights under any of the Option Documents, or if you fail to comply with your obligations thereunder, the damages to us would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity or otherwise, we shall be entitled to seek specific performance of the covenants, agreements and rights contained in each of the Option Documents, or, as permitted by applicable law, to seek full



© 2022 Point Digital Finance, Inc. 

rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity or otherwise, we shall thereafter be entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

6.3 **Repayment in Bankruptcy.** In the event we are required to and do remit or disgorge one or more dollars paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then Point shall be entitled to assert a claim against you for each such dollar remitted (and permitted costs herein) under the terms and conditions of this Agreement, and such claim by us shall begin to accrue on the date such dollar is actually remitted and shall automatically survive the term of this Agreement.

6.4 **Calculation of Liquidated Damages.** To the extent that enforcement of the Security Instrument and any power of sale granted under the Security Instrument require specification of an amount in default or liquidated bid amount, Owner and Point agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) default(s) as specified in this Section 6 may be uncertain, depend on many factors, and be extremely difficult to ascertain, and that a good faith effort to determine a method for reasonably estimating and liquidating such damages is the calculation of Liquidated Damages according to the Calculation of Point Proceeds set forth in Schedule 2. The amount in default or liquidated bid amount under any remedy may also include all, or any, of the following: (i) the sum of all monetary obligations owed to us by you under this Agreement; and (ii) any and all amounts, properly chargeable to you as necessary to satisfy your obligations with respect to your mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

6.5 **Remedies Concurrent and Not Exclusive.** The remedies set forth in this Section 6 shall be concurrent, cumulative and not exclusive, to the extent permitted by law. Every right, power and remedy granted to Point in the Option Documents shall be in addition to all those rights, powers and remedies granted to Point at law or in equity or by statute, and each such right, power and remedy may be exercised from time to time and as often and in such order as may be deemed expedient by Point to the extent permitted by law, and the exercise of any such right, power or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy.

## Section Seven:
## Miscellaneous

7.1 **Indemnification by Owner and Maximum Liability.** You hereby agree to defend, indemnify and hold Point harmless from, and against, any and all claims, damages, liabilities, actions and expenses (including, without limitation, attorneys' fees, to the extent permissible) of every kind arising out of or relating to: (a) a breach of any of your representations or warranties under this Agreement or the other Option Documents; (b) any act or omission by you or your agents; or (c) the Property. Notwithstanding your indemnification obligation under this Section 7.1, at our election, we may defend any third party claim subject to your indemnification obligation with counsel of our own choosing and without your participation. You shall not, without our prior written consent, settle or compromise any claim or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING OWNER'S INDEMNIFICATION OBLIGATION, IN NO EVENT SHALL POINT'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO



© 2022 Point Digital Finance, Inc.

THIS AGREEMENT OR THE PROPERTY EXCEED THE AMOUNT OF THE OPTION INVESTMENT PAYMENT.

7.2 **Asset Administration.** You acknowledge and consent to any assignment whereby the Asset Administrator's responsibilities, including, but not limited to, the right to enforce the Option Documents, are transferred from us to a third party. You will be notified of any change in the Asset Administrator within 30 days of such change.

7.3 **Covenants to Run With Land.** The provisions of this Agreement shall be deemed to be covenants running with the land so long as this Agreement remains in effect. We shall record a Notice of Option Purchase Agreement reflecting this fact in the public records. Upon valid termination of this Agreement, the Notice of Option Purchase Agreement shall automatically terminate, and we shall cause to be recorded such documents as are required to reflect such termination.

7.4 **Relationship.** Point shall not be deemed a partner, joint venturer, trustee, or fiduciary with, or of, Owner. Owner shall not be permitted to execute any document or enter into any agreement on behalf of Point. The Option is intended to be and shall be treated for all purposes (including, without limitation, tax purposes) as an option to purchase real property and not as a purchase, or joint venture.

7.5 **Multiple Owners and Revocable Trusts.**

7.5.1 **Multiple Owners.** If Owner is more than one person or entity: (i) the Option Documents must be signed by each such Owner; (ii) all rights and powers specified for Owner in the Option Documents must be approved and exercised unanimously by all such multiple Owners; (iii) all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under the Option Documents; (iv) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Section 7.13; and (v) Point may treat any notice received from any one Owner as notice from all Owners.

7.5.2 **Revocable Trusts.** If any Owner is/are the Trustor(s) or Trustee(s) of a Revocable Trust: (i) all Trustors must sign the Option Documents in their capacities as individuals and as Trustors; (ii) all Trustees must sign the Option Documents in their capacities as Trustees; (iii) each Trustee and Trustor who signs this Agreement hereby represents and warrants that all Trustees and Trustors have been disclosed to Point; (iv) all rights and powers specified for, and all actions required of, Owner in the Option Documents must be approved and exercised by all Trustees unanimously; (v) all Trustors, in their capacities as individuals, shall be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under the Option Documents; (vi) all representations and warranties by Owner in the Option Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (vii) notice required to be given by, or to, an Owner shall be deemed adequately given if given by, or to, any of the Trustees using the contact information set forth in Section 7.13 of this Agreement; and (viii) Point may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

7.6 **Delegation of Duties.** We may execute any of our duties under this Agreement or any other Option Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel shall be deemed to have been taken in good faith. We shall not be responsible for the negligence or misconduct of any agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.



© 2022 Point Digital Finance, Inc.

7.7 **Successors and Assignees; Owner's Estate.** The Option Documents shall be binding upon and insure to the benefit of Owner and Point and their respective heirs, successors and assignees. If the Owner dies, then the Option Documents shall be binding on the Owner's Estate. The death of the Owner shall not terminate any of the Option Documents. However, nothing in this provision shall permit assignment of any of the Option Documents contrary to the express provisions of this Agreement.

7.7.1 **Assignment by Point.** Point may assign, participate, hypothecate or sell, in whole or in part, Point's right and title to, and interest in, any of the Option Documents at any time and to any person or entity without prior notice to, or consent of, Owner. In connection with any assignment, Point may in its sole discretion disclose any and all documents and information in its possession relating to Owner and the Property, subject to its assignee's agreement to continue to observe Point's policies regarding privacy and disclosure of personal and financial information and applicable privacy laws. Upon such assignment, Point's assignee shall automatically have all the rights and remedies of Point under the Option Documents. Point and Owner shall execute and deliver in recordable form, if requested, at Point's expense, such other documents as are appropriate to reflect the assignment of the Option and the other Option Documents. Point and Owner agree to cooperate with such assignee and execute such additional documents as may be necessary to insure assignee's interest in the Property. Point shall notify Owner no later than 60 Business Days after the effective date of any such assignment.

7.7.2 **Assignment of Agreement by Owner.** Absent Point's prior written consent, which consent may be withheld in Point's sole discretion, Owner may not assign or otherwise transfer any of the Option Documents. Notwithstanding the foregoing, Point will generally not unreasonably withhold consent to such assignment to: (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse who acquires an undivided interest in the Property; provided that in each case the assignee (including, in the case of a Revocable Trust, any Trustor): (A) was alive as of the Effective Date, (B) executes this Agreement and, if applicable, the Notice of Option Purchase Agreement, and (C) executes such assignment with the assignor (hereinafter, **"Exempted Owner Assignment(s)"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, shall continue to remain liable under the Option Documents.

7.7.3 **Exempted Owner Property Transfer.** If Owner obtains Point's prior written consent, the Owner may Transfer the Property into the name of (i) the Trustee(s) of a Revocable Trust in which Owner is the sole Trustor (or if Owner is more than one person, together they constitute all of the Trustors); or (ii) Owner's spouse; provided that the requirements for an Exempted Owner Assignment under Section 7.7.2(A) – (D) are met (an **"Exempted Owner Property Transfer"**). An Exempted Owner Property Transfer will not be considered a Property Sale and will not trigger Point's right to exercise the Option.

7.8 **Survival.** The following provisions shall survive any termination of this Agreement: (a) the indemnification and liability cap provisions of Section 7.1; (b) the obligations to repay any and all Preservation Payments and Service Fees; (c) the obligation to remove any liens on the Property and pay any Sales Commissions, Closing Costs and or other expenses properly chargeable to Owner under Section 2; (d) any and all provisions which entitle Point to monetary remedies, fees, costs and expenses in connection with any Event of Default under Section 6; and (e) Sections 7.6 through 7.22 of this Agreement.



© 2022 Point Digital Finance, Inc.

7.9 **Injunction.** If we are stayed or enjoined from exercising the Option, commencing or initiating Option notice and exercise procedures hereunder (whether as a result of Owner's bankruptcy or otherwise), or enforcing any right of Point under this Agreement, the Option shall not expire until 90 Business Days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period prescribed in the Option Documents which we are prevented or prohibited from observing by operation of law or by court order, shall automatically be stayed for the duration of such stay, injunction or legal prohibition until such stay, injunction, or legal prohibition is no longer applicable or is lifted by final order of the appropriate court.

7.10 **Choice of Law; Venue.** The Option, this Agreement and the other Option Documents shall be determined under, governed by, and construed in accordance with California law, without regard to its conflict of law principles; provided, however, that to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws shall be deemed to govern and control. Subject to Section 7.20, the parties agree that all actions or proceedings arising in connection with this Agreement shall be arbitrated at a JAMS arbitration location, or injunctive relief sought only in the state and federal courts located in or having jurisdiction in the city or county in which the Property is located.

7.11 **Further Assurances.** The parties agree, from time to time, as and when requested by any other party to this Agreement and the other Option Documents or by its successors or assignees to: (a) execute and deliver, or cause to be executed and delivered, all such instruments; and (b) take, or cause to be taken, all such further or other actions as may be reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Option Documents.

7.12 **Severability; Waivers.** Each provision of this Agreement, and of the other Option Documents, shall be severable from every other provision for the purpose of determining the legal enforceability of any provision, which shall be construed separately and as separately enforceable from every other provision hereunder. No waiver by Point of any of its rights or remedies in connection with this Agreement or the other Option Documents shall be effective unless such waiver is in writing and signed by Point and Owner, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No delay or waiver by Point in exercising any right shall be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse. To the extent that enforcement of any provision, or exercise of any right, under this Agreement or the other Option Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then such provision shall be considered separately and apart from the remaining provisions, and any and all other remaining provisions shall continue to be fully enforceable under law.

7.13 **Notice.** Each party shall deliver all notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a **"Notice"**) in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address. Owner shall promptly notify Point of Owner's change of address. Notice to any one Owner shall constitute notice to all Owners unless applicable law expressly requires otherwise. Notice from any one Owner shall constitute notice from all Owners unless applicable law expressly requires otherwise. Each party shall deliver all Notices by first class mail, personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission). Except as otherwise provided in this Agreement, a notice to Owner



© 2022 Point Digital Finance, Inc.

in connection with this Agreement shall be deemed to have been given to Owner when mailed by first class mail or when actually delivered to Owner's notice address if sent by other means. Any notice in connection with this Agreement shall not be deemed to have been given to Point until actually received by Point. If any notice required by the Security Instrument is also required under applicable law, such requirement of the applicable law will satisfy the corresponding requirement under this Agreement.

| POINT: | OWNER: |
|---|---|
| Point Digital Finance, Inc.<br>PO Box 192<br>Palo Alto, CA 94302<br><br>**Personal or Overnight Delivery:**<br>Point Digital Finance, Inc.<br>Attn: Chief Executive Officer - NOTICES<br>444 High Street, 4th Floor<br>Palo Alto, CA 94301<br><br>Fax: 650-434-3778<br>Email: notices@point.com | Tamara M. Katzenberger<br>3130 MEADOW LN<br>GRAND JUNCTION, CO 81504<br>Phone: (970) 201-1850<br>Email: tomorrow_km@msn.com |

7.14 **Entire Agreement; Amendment.** The Schedules and Exhibits below, and any riders to this Agreement, are incorporated herein by this reference. This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the other written agreements made by and between Owner and Point as of the Effective Date together constitute the entire agreement between the parties pertaining to the subject matter contained in them. Except as expressly agreed in writing, all prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Option Documents, and the transaction which is the subject matter thereof, including but not limited to any and all offer letters, terms sheets and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification or amendment of this Agreement shall be binding unless in writing and executed by the party against whom enforcement is sought.

7.15 **No Third-Party Beneficiaries.** This Agreement and the other Option Documents are entered into for the protection and benefit of Point and Owner and their respective heirs, permitted successors, affiliates and assignees with regard to their respective present and contingent ownership interests in the Property. No other Person shall have any rights or causes of action under this Agreement or the other Option Documents.

7.16 **Counterparts; Electronic Signatures.** This Agreement and the other Option Documents may be executed in counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law,



© 2022 Point Digital Finance, Inc.

including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

7.17 **Registered Domestic Partnerships and Civil Unions.** An Owner shall have the same rights and obligations with respect to Owner's Civil Union Partner or Registered Domestic Partner as the Owner shall have with respect to its spouse for all purposes under the Option Documents, including Sections 7.7.2, 7.7.3 and 7.18 of this Agreement, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

7.18 **Consent of Spouse.** If you are married on the date of this Agreement and your spouse is not listed on the title to the Property, your spouse must execute and deliver to us a notarized Consent of Spouse in the form of Exhibit B attached to this Agreement (**"Consent of Spouse"**). If you should marry or remarry after the Effective Date, within 30 days after the marriage, you and your spouse shall execute and deliver to us a notarized Consent of Spouse. The Consent of Spouse will not be deemed to confer or convey to your spouse any rights in the Property that do not otherwise exist by operation of law.

7.19 **WAIVER OF JURY TRIAL.** TO THE FULLEST EXTENT PERMITTED BY LAW, POINT AND OWNER HEREBY VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE OPTION DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE OPTION DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN POINT AND OWNER.

7.20 **ARBITRATION.**

7.20.1 ***Arbitration.*** OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH POINT (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF POINT IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES (THE **"RULES"**) OF, AND PURSUANT TO THE STATE LAW OF, THE STATE OF CALIFORNIA, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2.

7.20.2 ***Procedure.*** OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, THE RESOLUTION EXPERTS (**"JAMS"**), AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. THE PARTIES SHALL BE ENTITLED TO PRE-HEARING DISCOVERY AND THE EXCHANGE OF NON-PRIVILEGED INFORMATION RELEVANT TO THE DISPUTE, CONSISTENT WITH JAMS' RULES AND CALIFORNIA LAW, AND AS OVERSEEN BY THE ARBITRATOR. OWNER AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. OWNER ALSO



© 2022 Point Digital Finance, Inc. 

AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW. OWNER UNDERSTANDS THAT POINT WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED.

7.20.3 ***Remedy.*** EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND POINT. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER THE OWNER NOR POINT WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

7.20.4 ***Availability of Injunctive Relief.*** BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF POINT ALLEGES OR CLAIMS A BREACH OF THE AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE POINT PROCEEDS IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

7.20.5 ***Small Claims Court.*** BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION.

7.20.6 ***Class Action Waiver.*** ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR WE MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS, OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

7.21 **TAX MATTERS.** OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN OPTION TO PURCHASE AN INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT POINT HAS REQUESTED THAT OWNER DISCUSS THIS



© 2022 Point Digital Finance, Inc. 

AGREEMENT WITH TAX, LEGAL AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

7.22 **NO ADVICE.** IN ENTERING INTO THE OPTION DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND SHALL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY POINT, ITS AGENTS, ITS AFFILIATES, OR ANY OF THEIR OFFICERS, EMPLOYEES OR AGENTS, REGARDING: (A) THE VALUE OF THE PROPERTY OR THAT THE ORIGINAL AGREED VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE OR FAIR MARKET VALUE OF THE PROPERTY; (B) THE ADVISABILITY OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE; OR (C) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE OPTION DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY POINT TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

7.23 **Cancellation.** You may cancel this Agreement at any time within three Business Days from the date you sign this Agreement. If you wish to cancel this Agreement, you must send written notice to us in accordance with Section 7.13 within three Business Days from the date you sign this Agreement. If you cancel this Agreement and have already received the Option Investment Payment, you agree to immediately repay the amount of the Option Investment Payment to us.

7.24 **Consent to be Contacted.** You expressly authorize us, our agents, representatives, affiliates, successors, and assigns to contact you for any purpose arising out of or relating to the Option or Option Documents at any phone number that you have provided us or will provide us in the future, including but not limited to autodialed or prerecorded phone calls or text messages, regardless of whether the phone number is a cellular telephone number or landline. You represent and warrant that you are the owner or regular user of any phone numbers that you provide us and acknowledge that your carrier's telephone minute and text charges may apply. You also agree to notify us immediately whenever you stop using any mobile numbers that you have provided us.

**[Signatures on Following Pages]**



© 2022 Point Digital Finance, Inc. 

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.

**POINT:**

POINT DIGITAL FINANCE, INC., a Delaware corporation

By: Jordan Fox

Name: Jordan D. Fox

Title: Assistant Secretary



© 2022 Point Digital Finance, Inc.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Point Digital Finance Option Purchase Agreement as of the Effective Date.

**OWNER:**

Tamara M. Katzenberger



© 2022 Point Digital Finance, Inc.



POINT

# APPENDIX A

## DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below:

**Acknowledged Pre-Existing Lien.** A perfected lien upon the Property securing an Acknowledged Pre-Existing Loan that is senior to (a) the lien of the Security Instrument, (b) the covenants running with the land under this Agreement, and (c) the Option; (i) of which Point had actual written notice under a title report, title search or title commitment obtained in connection with this Option transaction; and (ii) that is acknowledged in writing by Point before or upon Point's execution of this Agreement.

**Acknowledged Pre-Existing Loan.** An obligation secured by an Acknowledged Pre-Existing Lien, including, without limitation, any and all principal, interest, and expenses.

**Agreement.** This Point Digital Finance Option Purchase Agreement between Owner and Point and all exhibits, schedules, attachments, riders, and all amendments, supplements, and addenda now or hereafter executed by the parties.

**Aggregate Principal Balance of Indebtedness.** The amount of the total principal balance of the loans or any other indebtedness secured by liens on the Property plus the amount of the Point Proceeds as it is calculated at the time of determining the Aggregate Principal Balance of Indebtedness. In the case of an open-end line of credit, the unused portion of any line of credit shall be considered principal indebtedness.

**Appraisal.** Is defined in Section 4.3.1.

**Appraised Value.** Is defined in Section 4.3.1.

**Appreciation.** Is calculated as the Ending Agreed Value minus the Original Agreed Value.

**Arm's Length Transaction.** A transaction in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, as by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property. An Arm's Length Transaction would presumptively not include a transaction between family members or business associates, or where there are hidden terms or agreements or special understandings between the parties, whether written or oral, for the seller to regain ownership of the Property or the buyer to immediately resell the Property within 90 Business Days and the seller to receive any proceeds from such resell transaction.

**Asset Administrator.** The entity responsible for monitoring Owner's compliance with, and discharging Point's responsibilities and maintaining Point's rights under, this Agreement and the other Option Documents. Initially, the Asset Administrator will be Point Digital Finance, Inc.

**Business Days.** Any day other than a Saturday, a Sunday, Good Friday, the day after Thanksgiving, or a day on which commercial banks in New York or California are required or authorized to be closed.

**Calculation of Point Proceeds.** Is defined in Schedule 2.

**Civil Union Partner and Registered Domestic Partner.** The natural person having such status under the California Family Code Section 299 or applicable state law.



© 2022 Point Digital Finance, Inc.

**Closing Costs.** All (a) ordinary and customary costs in connection with any sale or other Transfer of the Property or any assignment or exercise of the Option related to such Transfer, including, without limitation, recording fees and costs, reconveyance fees, Escrow fees, title insurance fees or fees incurred in obtaining the Confirmation of Title elected by Point, transfer taxes and documentary transfer taxes, and (b) federal, state or local taxes (excluding income taxes) arising, incurred or owed in connection with (i) Point's exercise or sale of the Option, (ii) a Property Sale, (iii) any related closing of that sale, or (iv) any related Escrow. However, the term "Closing Costs" shall not include costs that are owed or incurred by a third party other than Point in connection with a sale of the Property to that third party.

**Confirmation of Title.** Confirmation of good and marketable title in and to the Property in fee simple and free of any liens or encumbrances of whatever character, subject only to the Permitted Encumbrances, to be provided, in Point's sole discretion, in the form either of a policy of title insurance issued to, or for the benefit of, Point or Point's assignee at the time that this Agreement is entered into (or at such other times as may be required by Point under this Agreement) and insuring Point's or Point's assignee's rights under the Option Documents; or of a written title report, abstract of title or other title search documentation reflecting, to Point's satisfaction, confirmation of its good and marketable title to Point's ownership interest in the Property.

**Consent of Spouse.** Is defined in Section 7.18.

**Debt Payoff.** Is defined in Section 4.1.10.

**Debt Payoff Amount.** The amount of the Option Investment Payment that Point and Owner agree will be paid, either through Escrow in connection with the Option Grant Closing or by Owner pursuant to Section 4.1.10, to settle existing debts and obligations of the Owner. An estimate of the Debt Payoff Amount is set forth in the Option Agreement Estimate and Closing Disclosure, and the exact amounts paid pursuant to the Debt Payoff will be set forth in a written confirmation from Point following the Option Grant Closing.

**Effective Date.** Is defined in the first paragraph of this Agreement.

**Effective Sale Price.** The monetary amount for which the Property is to be sold or transferred by Owner or Point, as applicable, to a Third Party Buyer, as adjusted, as set forth below. The Effective Sale Price shall be the sum of all amounts set forth or that would otherwise be set forth in the Closing Disclosure promulgated under TILA-RESPA rules (or any successor form) prepared by an Escrow Agent (which shall include the fair market value of any non-cash consideration received by, or for the benefit of, Owner and/or Point in connection with the sale of the Property). The Effective Sale Price will also be increased to capture agreements that benefit the Owner and decrease the sale price of the Property, including but not limited to below-market or free rent-back periods or assumptions of debt by the Third Party Buyer (such as a PACE or solar loans). The calculation of the Effective Sale Price shall not include any deduction for any: (a) Closing Costs; (b) liens on the Property; (c) outstanding taxes; (d) Sales Commissions; (e) appraisal expenses; (f) loans secured by the Property; (g) credits made by Seller to closing costs; and/or (h) amounts payable to Point hereunder.

**Ending Agreed Value.** The value of the Property as used in the Calculation of Point Proceeds and the determination of which is set forth in Schedule 2.

**Environmental Laws.** Is defined in Section 5.5.

**Escrow.** A transaction settlement, typically consisting of an exchange and disbursement of consideration, costs, and proceeds, and documentation of clear title to the Property, using the services of an Escrow



© 2022 Point Digital Finance, Inc.

Agent.

**Escrow Agent.** A title company reasonably acceptable to Point as contemplated by Section 2 or any neutral third party Escrow agent, settlement agent, title agent or attorney closing firm that closes or settles any transaction contemplated hereunder.

**Event of Default.** Is defined in Section 6.1.

**Exempted Owner Assignment.** Is defined in Section 7.7.2.

**Exempted Owner Property Transfer.** Is defined in Section 7.7.3.

**Exercise Payment.** The amount of the Option Consideration minus the Option Investment Payment, as such amount may be reduced pursuant to Section 4.4.3. The purchase by Point of its Option Percentage in the Property occurs by payment or debit of the Exercise Payment. The Exercise Payment is a defined term used in various calculations made under this Agreement, and when so used shall refer to the applicable dollar amount employed whether or not the Option is, in fact, exercised.

**Exercise Payment Escrow Account.** Is defined in Section 2.2.2.

**Exercise Payment Insurance Reduction.** Is defined in Section 4.4.3.

**Expiration Date.** The day described in Section 1.1.

**Grant Deed.** A grant deed, executed by Owner and notarized, in form and substance acceptable to the Escrow Agent, that, when recorded, will deliver to Point, or its assignee (or to a Third Party Buyer, where applicable), good and marketable fee simple title to Point's undivided percentage interest in the Property, subject to (a) the standard printed exceptions described in the policy of title insurance covering the Property, or, where applicable, any written exceptions disclosed in the Option Confirmation of Title; (b) the standard printed exceptions of the Escrow Agent, if any; and (c) the Permitted Encumbrances, provided that all outstanding obligations under the Permitted Encumbrances are current.

**JAMS.** Is defined in Section 7.20.2.

**Net Condemnation Proceeds.** Is defined in Section 4.5.

**Non-Owner Occupied Property.** Property that is rented or leased by the Owner to third parties while there is not at least one Owner regularly occupying the Property as a residence for living and sleeping quarters, provided that a Property will not be deemed a Non-Owner Occupied Property if it has short term rentals (with rental periods less than 30 days) where such short term rentals occur an aggregate of less than three months out of a six month period. A Non-Owner Occupied Property may not be subject to any lease or rent agreement that extends beyond the Expiration Date.

**Notice.** Is defined in Section 7.13.

**Notice of Option Exercise After Default.** Is defined in Section 2.3.1.

**Notice of Option Exercise as of Expiration Date.** Is defined in Section 2.2.2(a).

**Notice of Option Exercise Upon a Sale.** Is defined in Section 2.1.2.



© 2022 Point Digital Finance, Inc.



POINT

**Notice of Option Purchase Agreement.** Is defined in Section 1.5.

**Notice of Right to Cure Default.** Is defined in Section 2.3.1.

**Option.** Is defined in Section 1.1.

**Option Consideration.** Is defined in Section 1.1.

**Option Documents.** This Agreement, the Notice of Option Purchase Agreement, the Security Instrument, and the Consent of Spouse, and any riders, amendments or supplements to any of these documents.

**Option Exercise.** Is defined as Point's election to purchase the Option Percentage.

**Option Exercise After Default.** Is defined in Section 2.3.

**Option Exercise as of Expiration Date.** Is defined in Section 2.2.

**Option Exercise Upon a Sale.** Is defined in Section 2.1.

**Option Grant Closing.** Is defined in Section 1.3.1.

**Option Investment Payment.** Is defined in Section 1.1.

**Option Percentage.** Is defined in Section 1.1.

**Option Term.** Is defined in Section 1.2.

**Original Agreed Value.** The starting value of the Property, for purposes of this Agreement only, determined by Point in reliance on various factors, such as independent appraisals, automated valuation models, and Point's proprietary valuation and risk assessment methods, and agreed to by the Owner at the time of the origination of the Option, as specified in Section 1.1. In some cases, the Original Agreed Value may be less than the Appraised Value of the Property as of the Effective Date as a reflection of certain risk adjustments.

**Owner.** All of the persons or entities, individually and collectively, who appear on the record title to the Property as holding fee simple title to 100% of the Property as of the Effective Date.

**Owner's Estate.** Collectively the executor, personal representative and other persons charged with the administration and distribution of the Property following the death of the Owner, and the heirs, beneficiaries, persons and trusts who are entitled to receive the Property when it is distributed following the death of the Owner, whether pursuant to form of title on the Property, the deceased Owner's will or Revocable Trust, the laws of intestacy, or any other means.

**Owner Occupied Property.** Property that is not rented or leased and that at least one Owner (or if the Property is held in a Revocable Trust, one Owner or one Trustor) regularly occupies as a residence for living and sleeping quarters.

**Owner Option Repurchase.** Is defined in Section 1.4.



© 2022 Point Digital Finance, Inc.

**Permitted Encumbrances.** All licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject at the time the Option Documents become effective: (a) that are stated as exceptions on the Confirmation of Title, or (b) to which Point has expressly agreed in writing that the Property will remain subject following any exercise of the Option by Point. In no event will "Permitted Encumbrances" include any Senior Loans, Senior Liens, or any other liens that secure the payment of any loans or the performance of any obligations owed to any creditor.

**Permitted Sale.** Is defined in Section 2.1.1.

**Person.** An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing.

**Point Proceeds.** The amount calculated as the monetary interest of Point under the Agreement and Option Documents, as further defined and calculated under Schedule 2.

**Point Proceeds Cap.** Is defined in Section 1.4.

**Point's Rights.** The Point Proceeds due to Point, together with all interests and rights that Point has with regard to the Property (matured or unmatured, contingent or non-contingent, present or prospective), whether the Option has or has not been exercised, and all other rights that Point may have under the Option Documents.

**Preservation Payments.** Is defined in Section 4.2.2.

**Property.** The residential real property owned by Owner that is the subject of the Option Documents. The legal description of the Property is set forth in Schedule 1 to this Agreement. The Property shall include only the real property described in that Schedule 1 and the fixtures appurtenant to that real property, and shall not include any other personal property of Owner.

**Property Sale.** A sale or Transfer by Owner (or by Point following exercise of Option) of all, or an interest in, the Property. This term excludes the sale of Point's ownership interest pursuant to the Option. A Property Sale by the Owner must also be a Permitted Sale. An Exempted Owner Property Transfer is not considered a Property Sale.

**Registered Domestic Partner.** See "Civil Union Partner and Registered Domestic Partner" above.

**Rental Premium.** A premium added to the Point Proceeds to account for potential loss of value of the Property resulting from use of the Property as a rental property. The Rental Premium shall equal 10% of the Appreciation multiplied by the Option Percentage, where Appreciation is calculated as the Ending Agreed Value minus the Original Agreed Value [Rental Premium = 10% × (Ending Agreed Value - Original Agreed Value) × Option Percentage]. If the Ending Agreed Value is less than the Original Agreed Value, no Rental Premium will apply. An example follows:

- Original Agreed Value of Home at $500,000, and Ending Agreed Value at $1,000,000. Point has 20% Option Percentage.
- Appreciation is $500,000 = $1,000,000 (Ending Agreed Value) – $500,000 (Original Agreed Value).
- Rental Premium is $10,000 = 10% × $500,000 (Appreciation) × 20% (Option Percentage).



© 2022 Point Digital Finance, Inc.



POINT

**Revocable Trust.** A revocable trust, revocable living trust, *inter vivos* trust, revocable family trust or similar trust established in accordance with the laws of any state.

**Rules.** Is defined in Section 7.20.1.

**Sales Commissions.** All broker fees, sales commissions, finder fees and all other fees and costs owed to any broker, real estate agent or finder and incurred in connection with a sale or Transfer of the Property or any interest in the Property.

**Security Instrument.** Is defined in Section 1.5.

**Senior Liens.** Liens on the Property that are perfected prior to or are otherwise senior to Point's Point Proceeds.

**Senior Loans.** Loans or other obligations that are secured by Senior Liens.

**Service Fees.** Fees, costs and charges of the type further described in Section 4.1.4, which Service Fees are designed to compensate the Asset Administrator for the time, effort, costs and expenses incurred by the Asset Administrator in responding to requests from Owner or defaults by Owner under the Option Documents or in performing other necessary and reasonable acts pursuant to the Option Documents.

**Transfer.** A sale, exchange, transfer, conveyance or assignment of all or any part of the Property or any legal or beneficial interest in the Property, unless the sale, exchange, transfer, conveyance or assignment is to a surviving Owner or estate of an Owner in the event of a death of an Owner.

**Third Party Buyer.** The Person that purchases, or proposes to purchase, the Property in a Property Sale or Transfer of the Property.

**Trustee(s).** The Person or Persons designated as the "trustee" of a Revocable Trust in its formation documents and any subsequent amendments, and any successor trustees under such Revocable Trust.

**Trustor(s).** The Person or Persons designated as the "trustor", "settlor" or "grantor" of a Revocable Trust in its formation documents and any subsequent amendments.



© 2022 Point Digital Finance, Inc.

## Schedule 1

## LEGAL DESCRIPTION

LOT 5 IN BLOCK 2 OF GROVE CREEK SUBDIVISION, FILING 3, COUNTY OF MESA, STATE OF COLORADO IN THE
COUNTY OF MESA AND STATE OF COLORADO.

APN: 2943-153-67-005

[end of legal description]



© 2022 Point Digital Finance, Inc.

## Schedule 2

## CALCULATION OF POINT PROCEEDS

A. **Formula for Calculation of Point Proceeds.** Except as otherwise provided in this Agreement, any calculation of the value of the Point Proceeds under this Agreement, the other Option Documents, or otherwise shall be calculated as the total of the following (**"Calculation of Point Proceeds"**):

**Point Proceeds** = Lesser of {**Point Proceeds Cap** and [(**Ending Agreed Value** × **Option Percentage**) – **Exercise Payment** + **Rental Premium**†]} + **Service Fees**† + **Preservation Payments**†

† if applicable

- the *lesser* of the following:
  - › the **Point Proceeds Cap**, as calculated in Section B below, and
  - › the *sum* of the following:
    - » the **Ending Agreed Value** as specified in Section C below *multiplied* by the **Option Percentage**;
    - » *minus* the **Exercise Payment**, subject to reductions(1) and adjustments(2) below;
    - » *plus* the **Rental Premium** if a designated **Owner-Occupied Property** has been rented or leased in the previous six month period and Ending Agreed Value exceeds Original Agreed Value;
- *plus* all monetary amounts owed to Point in the form of unpaid **Service Fees** and unreimbursed **Preservation Payments** (including any unpaid interest and other fees and charges associated with such Preservation Payments), provided that Owner has not already delivered any such amounts

---

(1) The Exercise Payment amount will be reduced if an Exercise Payment Insurance Reduction is deemed to be applicable under Section 4.4.3.

(2) If Point has previously delivered the Exercise Payment to Owner at an Option Exercise pursuant to Sections 2.2 or 2.3, then the value of the Exercise Payment shall not be deducted from the Point Proceeds to be paid to Point.

B. **Calculating the Point Proceeds Cap.** The Calculation of the Point Proceeds takes into account the Point Proceeds Cap, which may limit the amount an Owner is obligated to pay to Point. The Point Proceeds Cap is calculated as follows:

**Point Proceeds Cap** = **Option Investment Payment** × [1 + (**Point Proceeds Cap Factor** / 12)]$^{M}$

where **M,** used as an exponent, represents the number of months (including partial months) that have fully elapsed since the Effective Date.

C. **Determining Ending Agreed Value.** The following Ending Agreed Values shall apply to the Calculation of Point Proceeds:

(1) **Property Sale.** Except as provided in C.2. below, in any Property Sale, the Ending Agreed Value shall be the greater of (a) the Effective Sale Price and (b) the Appraised Value, if available.

(2) **Property Sale or Owner Option Repurchase After Event of Default.** In the event of a Property Sale initiated by us following an Option Exercise After Default in accordance with Section 2.3.4 or an Owner Option Repurchase in accordance with Section 2.3.6, the Ending Agreed Value shall



© 2022 Point Digital Finance, Inc.



POINT

be the greater of (a) the Effective Sale Price, if any, (b) the highest Appraised Value of the Property calculated between the date of an Event of Default through the date of closing of such Property Sale or Owner Option Repurchase, and (c) the Original Agreed Value.

(3) **Owner Option Repurchase.** Except as otherwise provided in Section 1.4.1, in any Owner Option Repurchase during the Option Term not involving a Property Sale or Event of Default, the Ending Agreed Value shall be the Appraised Value of the Property at the time of the Owner Option Repurchase.

(4) **Insurance Allocation.** In any insurance allocation under Section 4.4, the Ending Agreed Value shall be the Appraised Value of the Property immediately prior to the destruction or damage.

(5) **Condemnation.** In any total condemnation or partial condemnation of the Property, the Ending Agreed Value shall be the Net Condemnation Proceeds under Section 4.5.

D. **Damage Calculations.** In any calculation of damages due to Point following an Event of Default, or any calculation of Liquidated Damages under this Agreement, the Ending Agreed Value for determining the Point Proceeds shall be the highest Appraised Value of the Property calculated between the date of any Event of Default through the date Point accepts payment from Owner in discharge of Point's Rights hereunder; and provided, further, that in the event of any calculation of damages or Liquidated Damages following any Event of Default under Section 6.4 of the Agreement, the Ending Agreed Value shall be the higher of (a) the highest Appraised Value of the Property calculated between the date of any Event of Default hereunder through the date Point accepts payment from Owner in full discharge of Point's Rights hereunder; and (b) the Original Agreed Value.



© 2022 Point Digital Finance, Inc.

## Schedule 3

## PAYOFF SCHEDULE

Point and Owner agree the Debt Payoff Amount will be distributed as follows:

- **Amounts Paid Through Escrow in Connection with Option Grant Closing:** Point and Owner will instruct the Escrow Agent handling the Option Grant Closing to make the following disbursements:

| Creditor | Account Ending In | Paid Through Escrow |
|---|---|---|
| HUD -PARTIAL CLAIM CASH MANAGEMENT | 9312 | $16,421.00 |
| LAKEVIEW LOAN SERVICING, LLC | 7588 | $2,761.42 |
| HUD-PARTIAL CLAIM CASH MANAGEMENT | 0585 | $19,581.92 |
| Grove Oak HOA | 4793 | $2,412.00 |
| LAKEVIEW LOAN SERVICING, LLC | 7588 | $411.89 |

- end of table -

Point and Owner agree that the Debt Payoff Amounts above represent the amounts due to the creditors listed above as of July 13, 2022. These amounts may increase due to accrual of interest between July 13, 2022 and the date funds are disbursed through escrow. These amounts may also decrease due to payments made by Owner prior to Option Grant Closing. Point and Owner agree that the actual amount to be paid through escrow to the creditors above will include all interest accrued and due as of the date of the Option Grant Closing and may be an amount greater or lesser than the Debt Payoff Amounts indicated above. The final Debt Payoff Amount to be paid through escrow will be disclosed to Owner in connection with the Option Grant Closing, and any amounts due to creditors in excess of the amount specified above will be deducted from the remaining Option Investment Payment due to Owner.



© 2022 Point Digital Finance, Inc.

# EXHIBIT A

## SECURITY INSTRUMENT

© 2022 Point Digital Finance, Inc.

**EXHIBIT B**

**CONSENT OF SPOUSE**

© 2022 Point Digital Finance, Inc. 

PT-320820

Certified Original Document

Certified Original Document

**Prepared by, recording requested by, and when recorded mail to:**

Point Digital Finance, Inc.
PO Box 192
Palo Alto, CA 94302

point.com

Option Agreement ID: 2022223-IVEVU

Property APN: 2943-153-67-005

(Space Above for Recorder's Use)

# DEED OF TRUST

**NOTICE: THIS DEED OF TRUST CONTAINS A SUBORDINATION CLAUSE WHICH MAY RESULT IN BENEFICIARY'S SECURITY OR OTHER INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

This **DEED OF TRUST**, together with any riders hereto (**"Security Instrument"**), is made as of July 28, 2022 (**"Effective Date"**), among Tamara M. Katzenberger (in both his/her individual capacity and as trustor, **"Owner"**), and Mesa County Public Trustee (**"Trustee"**), and Point Digital Finance, Inc., a Delaware corporation, and its successors and assignees (**"Beneficiary"**).

The following riders are to be executed by Owner [check box as applicable]:

☐ Condominium Rider

☒ Planned Unit Development Rider

## RECITALS

A. This Security Instrument is given in connection with the execution of that certain Point Digital Finance Option Purchase Agreement (**"Option Agreement"**), entered into by and between Owner and Beneficiary, pursuant to which Owner grants and conveys to Beneficiary the option to purchase (**"Option"**) an undivided percentage interest (the **"Option Percentage"**) in that certain real property and improvements thereon in County of Mesa, State of Colorado, as more particularly described in Schedule A attached hereto and incorporated herein by this reference, and commonly known as 3130 MEADOW LN, GRAND JUNCTION, CO 81504 (**"Real Property"**). The initial term of the Option shall commence on the Effective Date and shall expire on July 28, 2052. In exchange for granting the Option to Beneficiary, Beneficiary paid to Owner an Option Investment Payment amount equal to $74,000.00.

© 2022 Point Digital Finance, Inc

B. Beneficiary desires to secure the rights granted to it in the Option Agreement and the performance of Obligations (hereinafter defined).

C. This Security Instrument is given pursuant to the Option Agreement, and payment, fulfillment, and performance of the obligations due under the Option Agreement are secured by this Security Instrument in accordance with the terms set forth herein.

D. Capitalized terms used in this Security Instrument shall have the meanings specified herein, or if not defined herein, in the Option Agreement. The Option Agreement and certain other ancillary documents (which documents, together with the Security Instrument, are collectively termed the **"Option Documents"**) are executed by Owner and Beneficiary concurrently herewith.

**1.** **Grant in Trust**. OWNER HEREBY IRREVOCABLY grants, transfers and assigns to Trustee, and its successors and assignees, a security interest, with power of sale, for the benefit of Beneficiary and its successors and assigns in and to the following property, rights, interests and estates now owned, or hereafter acquired by Owner (collectively, the **"Property"**):

**a.** Real Property. The Real Property together with all improvements, replacements and additions now or hereafter erected on the Real Property and all easements, appurtenances and fixtures now or hereafter a part of the Real Property.

**b.** Leases and Rents. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Real Property, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively, the **"Leases"**) and all right, title and interest of Owner, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Owner or its agents or employees from any and all sources arising from or attributable to the Real Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of

© 2022 Point Digital Finance, Inc

the use and occupancy of property or rendering of services by Owner and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively, the **"Rents"**) and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Point Proceeds. As used herein, **"Creditors Rights Laws"** shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

**c.** Insurance Proceeds. All insurance proceeds in respect of the Real Property under any insurance policies covering the Real Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Real Property (collectively, the **"Insurance Proceeds"**).

**d.** Condemnation Awards. All condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Real Property (collectively, the **"Awards"**).

**CONDITIONS TO GRANT:** TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Beneficiary and its successors and assigns, forever, WITH THE POWER OF SALE, to secure Owner's payment to Beneficiary of the Point Proceeds and the performance of the Obligations at the time and in the manner provided in the Option Documents and this Security Instrument;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Owner shall well and truly (a) pay to Beneficiary the Point Proceeds at the time and in the manner provided in the Option Agreement, this Security Instrument and the other Option Documents, (b) perform the Obligations as set forth in the Option Agreement, this Security Instrument and the other Option Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Option Agreement, this Security Instrument and the other Option Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Owner's obligation to indemnify and hold harmless Beneficiary pursuant to the provisions hereof shall survive any such payment and release.

**2. Secured Obligations.**

**a.** Obligations. Owner makes the grant, transfer and assignment set forth in Section 1 above for the purpose of securing the following **"Obligations"**:

© 2022 Point Digital Finance, Inc

(1) the payment of the Point Proceeds;

(2) all other obligations of Owner contained herein;

(3) each obligation of Owner contained in the Option Agreement and any ancillary document;

(4) each obligation of Owner contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Option Agreement;

(5) any expenditures made by Beneficiary pursuant to, or under, this Security Instrument; and

(6) payment of all fees and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel (collectively **"Attorneys' Fees"**)) incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Attorneys' Fees shall include, Attorneys' Fees incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

**b.** Option Investment Payment. Owner shall not be obligated to repay any part of the Option Investment Payment (as such term is defined in the Option Agreement); and therefore, such item shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payment calculated and agreed by Owner to be paid pursuant to the Option Agreement.

**3. Uniform Commercial Code Security Agreement and Fixture Filing**. This Security Instrument also is intended to be and shall constitute a security agreement under the Colorado Uniform Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the Colorado Uniform Commercial Code. Owner hereby grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

**a.** Owner agrees that Beneficiary may file either this Security Instrument, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of the Secretary of State of the State of Colorado, as a financing statement for any of the items specified above as part of the Property.

**b.** This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 4-9-502(c) and 4-9-514 of the Colorado Uniform Commercial Code, and any similar or successor provisions.

**c.** Beneficiary may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

**d.** Owner shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Beneficiary may reasonably require.

**e.** On any default hereunder, Beneficiary shall have the remedies of a secured party under the Colorado Uniform Commercial Code and may also invoke the remedies in Section 7 below. In exercising any of these remedies, Beneficiary may proceed against the items of Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the Colorado Uniform Commercial Code or the remedies in Section 7 below.

4. **Assignment of Leases and Rents**. Owner hereby absolutely and unconditionally assigns to Beneficiary and Trustee all of Owner's right, title and interest in and to all current and future Leases and Rents; it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

**a.** Owner hereby gives to, and confers upon, Beneficiary the right, power and authority, during the continuance of this Security Instrument, to collect the Rents, reserving unto Owner the right, prior to any default by Owner in payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

**b.** Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Beneficiary may determine.

**c.** The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this Security Instrument, shall not cure or waive any default or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

**d.** Nothing in this section shall permit Owner to lease or rent the Property in contravention of any provision of the Option Agreement; nor shall anything in this section modify any provision in the Option Agreement relating to the use, lease or occupancy of the Property.

**5.** **<u>Covenants of Owner Regarding the Property</u>**. Owner hereby agrees as follows:

**a.** To appear in and defend any action or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses of Trustee and Beneficiary (including cost of evidence of title and Attorneys' Fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Security Instrument or to collect the Obligations or to protect Beneficiary's rights under this Security Instrument; and/or (ii) in connection with the enforcement of any provisions of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument (whether or not suit is filed).

**b.** To pay at least ten days before delinquency all taxes and assessments affecting the Property; and all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees and expenses of this Security Instrument.

**(1)** If Owner fails to make any payment or to do any act as provided in this Security Instrument, Beneficiary or Trustee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Beneficiary or Trustee to protect the security for this Security Instrument, which payments and related expenses (including Attorneys' Fees) shall also be secured by this Security Instrument.

**(2)** Such performance by Beneficiary or Trustee shall not require notice to, or demand on, Owner and shall not release Owner from any obligation under this Security Instrument.

**(3)** Beneficiary or Trustee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary or Trustee under this Security Instrument, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary or Trustee appears to be prior or superior to this Security Instrument, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

**c.** To pay immediately upon demand all sums expended by Beneficiary or Trustee pursuant to this Security Instrument; and to pay interest on any of the foregoing amounts demanded by Beneficiary or Trustee at the rate specified in Colorado Revised Statute Section 5-

12-101 (or other applicable law) from the date of such demand, not to exceed the maximum rate allowed by law at the time of such demand.

6. <u>Power of Attorney</u>. Owner hereby irrevocably appoints Beneficiary as Owner's attorney-in-fact (such agency being coupled with an interest). As such attorney-in-fact Beneficiary may, after providing notice to Owner pursuant to the Option Agreement (without the obligation to do so) in Beneficiary's name, or in the name of Owner, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Beneficiary's security interests and rights in or to any of the Property, and, upon a default under this Security Instrument, take any other action required of Owner; provided, however, that Beneficiary as such attorney-in-fact shall be accountable only for such funds as are actually received by Beneficiary.

7. <u>Default and Foreclosure and Power of Sale</u>. Upon Owner's default under or breach of any of the rights and Obligations that are secured by this Security Instrument as specified above, Beneficiary may declare all performance and sums secured by this Security Instrument immediately due by delivery to Trustee and to Owner of written declaration of default. Beneficiary shall give notice of default to Owner prior to acceleration following Owner's breach of any covenant or agreement in this Security Instrument. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Owner, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the performance secured by this Security Instrument and sale of the Property. The notice shall further inform Owner of the right to cure after acceleration and the right to bring an action to assert the non-existence of a default or any other defense of Owner to acceleration and sale. If the default is not cured on or before the date specified in the notice, Beneficiary at its option may require immediate performance in full of all obligations secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Beneficiary shall be entitled to collect all expenses incurred in pursuing the remedies provided herein, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Beneficiary invokes the power of sale, Beneficiary shall execute or cause Trustee to execute a written notice of Beneficiary's election to cause the Property to be sold as prescribed by applicable law. Beneficiary shall mail a copy of the notice to Owner as provided by Applicable Law. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Beneficiary or Trustee shall mail copies of the notice as prescribed by applicable law to Owner and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. Beneficiary also shall deposit with Trustee this Security Instrument, the Option Agreement, and all documents evidencing any expenditures and damages secured by this Security Instrument.

After the time required by applicable law, Trustee, without demand on Owner, shall

sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.

Trustee shall deliver to the purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of their truthfulness. Any person, including Owner, Trustee, or Beneficiary as defined in this Security Instrument, may purchase at such sale.

**a.** After deducting all costs, fees and expenses (including Attorneys' Fees) of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: (i) to Beneficiary, all sums expended and performance due under the terms of this Security Instrument, not then repaid, with accrued interest, if any, at the amount allowed by law in effect on the Effective Date of this Security Instrument; (ii) to Beneficiary, all other sums then secured hereby; and (iii) the remainder, if any, to the person or persons legally entitled thereto.

**b.** Notice provided to Owner under this Security Instrument shall be delivered to the address specified in Section 22 of this Security Instrument in accordance with the applicable terms and conditions of the Option Agreement unless otherwise required by applicable law.

**c.** Exercise of Beneficiary's remedies under this Security Instrument shall be in compliance with applicable law.

**8.** <u>**Liquidated Damages**</u>. Liquidated Damages means an amount equal to the sum of

**a.** the Point Proceeds as calculated pursuant to the Option Agreement;

**b.** in connection with Owner's failure to make any monetary payment, the sum of all monetary obligations (including, without limitation, all Preservation Payments) owed to Beneficiary by Owner under the Option Agreement; and

**c.** any and all amounts, properly chargeable to Owner as necessary to satisfy Owner's obligations under the Option Agreement with respect to Owner's mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other penalties.

**9.** <u>**Late Performance**</u>. By accepting performance of any obligation after its due date, Beneficiary does not waive its right either to require prompt performance when due of all other obligations or to declare default for such failure to perform.

**10.** <u>**Trustee's Powers**</u>. At any time or from time to time, without liability therefor upon written request of Beneficiary and presentation of this Security Instrument, and without affecting

© 2022 Point Digital Finance, Inc

the personal liability of any person for the performance of the Option Agreement secured hereby, Trustee may: (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement thereon; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

**11.** <u>**Substitution of Trustee**</u>. Beneficiary, or any successor in ownership of the Obligations, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named or acting under this Security Instrument, which instrument, when executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where the Property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from Trustee's predecessor, succeed to all its title, estate, rights, powers and duties. Such instrument must contain the name of the original Owner, Trustee and Beneficiary under this Security Instrument, the book and page where this Security Instrument is recorded, and the name and address of the new Trustee(s).

**12.** <u>**Trustee's Compensation**</u>. Owner shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this Trust, including Attorneys' Fees.

**13.** <u>**Release**</u>. Upon performance of all obligations secured by this Security Instrument, Beneficiary shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing obligations secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

**14.** <u>**Successors**</u>. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "Beneficiary" shall include any successor or assignee of Beneficiary's rights in the Option Agreement and in this Security Instrument, whether or not named as Beneficiary in this Security Instrument. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

**15.** <u>**Joint and Several Liability**</u>. If more than one person signs this Security Instrument as Owner, the obligations of each signatory shall be joint and several.

**16.** <u>**Multiple Owners**</u>. If there are multiple Owners of the Property:

**a.** this Security Instrument must be signed by each such Owner;

**b.** all rights and powers specified for Owner in this Security Instrument must be approved and exercised unanimously by all such multiple Owners;

© 2022 Point Digital Finance, Inc 

c. all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under this Security Instrument;

d. notice required to be given by, or to, Owner will be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Section 22 of this Security Instrument; and

e. Beneficiary may treat any notice received from any one Owner as notice from all Owners.

17. <u>Revocable Trust</u>. If any Owner is/are the trustee(s) of a Revocable Trust (as defined in the Option Agreement):

a. all trustees of the Revocable Trust and all individuals having the power to revoke the Revocable Trust (referred to herein as "owners of the Revocable Trust") must sign this Security Instrument in their respective capacities as trustees and/or owners of the Revocable Trust, and each trustee and owner of the Revocable Trust who signs this Security Instrument hereby represents and warrants that all trustees and owners of the Revocable Trust have been disclosed to Beneficiary;

b. any trustee of the Revocable Trust who is also an owner of the Revocable Trust need only sign this Security Instrument once for it to be binding on such person both as trustee and as owner of the Revocable Trust;

c. all rights and powers specified for, and all actions required of, Owner in this Security Instrument must be approved and exercised unanimously by all trustees of the Revocable Trust;

d. all trustees and all owners of the Revocable Trust shall be jointly and severally liable for all liabilities and obligations specified for Owner under this Security Instrument;

e. all representations and warranties by Owner in this Security Instrument are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all owners of the Revocable Trust;

f. notice required to be given by, or to, any Owner will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in Section 22 of this Security Instrument; and

g. Beneficiary may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Owner.

18. <u>Acceptance by Trustee</u>. Trustee accepts this Trust when this Security Instrument,

© 2022 Point Digital Finance, Inc

duly executed and acknowledged, is made a public record as provided by law.

19. **Extent of Lien**. The lien granted under this Security Instrument shall encumber Owner's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

20. **No Merger**. So long as any of the obligations under the Option Agreement remains outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Owner in the Property or any part thereof (including the estate of Beneficiary after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other Person.

21. **Notice of Option Purchase Agreement**. Owner hereby provides notice that Owner and Beneficiary have entered into the Option Agreement, as more particularly described in Schedule B attached hereto and incorporated herein by this reference as if set forth in full. The Option Agreement contains certain covenants and promises to or for the benefit of Beneficiary. The Option Agreement is irrevocable by Owner and expires on July 28, 2052. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement is contained in the instrument conveying such interest in the Property to such person or entity.

22. **Notices**. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

| | |
|---|---|
| **POINT:**<br>Point Digital Finance, Inc.<br>PO Box 192<br>Palo Alto, CA 94302<br><br>**Personal or Overnight Delivery:**<br>Point Digital Finance, Inc.<br>Attn: Chief Executive Officer - NOTICES<br>444 High Street, 4th Floor<br>Palo Alto, California 94301<br><br>Fax: 650-434-3778<br>Email: notices@point.com | **OWNER:**<br>Tamara M. Katzenberger<br>3130 MEADOW LN<br>GRAND JUNCTION, CO 81504<br><br>**TRUSTEE:**<br>Mesa County Public Trustee<br>PO BOX 20000<br>Grand Junction, Colorado 81502 |

23. Waiver of Homestead. Borrower waives all right of homestead exemption in the Property.

**Do not lose or destroy this Security Instrument or the Option Agreement that it secures. All must be delivered to Trustee for cancellation before release will be made.**

**[Signatures on Following Page]**

© 2022 Point Digital Finance, Inc

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFICIARY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT AND OPTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFICIARY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, each undersigned Owner has executed this Security Instrument as of the date set forth above.

**OWNER(S):**

By: [signature] Date: 7/28/2022

Tamara M. Katzenberger

## ACKNOWLEDGMENT

State of ~~Colorado~~ OR Oregon )
) §
County of Multnomah )

The foregoing instrument was acknowledged before me this 28th day of July, 2022,

by Tamara M. Katzenberger

Witness my hand and official seal.

[signature]

(Signature of Notary)

(Seal of Notary)

OFFICIAL STAMP
DONNA MARIA KISSANE
NOTARY PUBLIC - OREGON
COMMISSION NO. 981768
MY COMMISSION EXPIRES DECEMBER 02, 2022

12/2/2022

(Commission Expiration)

## SCHEDULE A

## LEGAL DESCRIPTION

LOT 5 IN BLOCK 2 OF GROVE CREEK SUBDIVISION, FILING 3, COUNTY OF MESA, STATE OF COLORADO IN THE
COUNTY OF MESA AND STATE OF COLORADO.

APN: 2943-153-67-005

[end of legal description]

## SCHEDULE B

## NOTICE OF OPTION

This Notice of Option (**"Option Notice"**) provides notice of that certain Option Agreement entered into as of July 28, 2022 (**"Effective Date"**), by and between Tamara M. Katzenberger and Beneficiary, and supplements the Security Instrument of the same date between the same parties. Capitalized terms used in this Option Notice shall have the meanings specified herein, or if not defined herein, in the Option Agreement or the Security Instrument.

RECITALS

1. Owner hereby declares that as of the Effective Date, Owner and Beneficiary have entered into that certain unrecorded Point Digital Finance Option Purchase Agreement (**"Option Agreement"**), which is hereby incorporated into this Option Notice as if set forth in full, pursuant to which Owner grants and conveys to Beneficiary the option to purchase (**"Option"**) an undivided percentage interest (the **"Option Percentage"**) of fee simple title ownership in the Property. In exchange for granting the Option to Beneficiary, Beneficiary paid to Owner an Option Investment Payment equal to **$74,000.00**. The Option is irrevocable by Owner and expires on **July 28, 2052**.

2. Pursuant to the Option Agreement, Owner has made certain covenants and promises to, or for the benefit of, Beneficiary in connection with the Property, all as more particularly described, and on the terms and conditions stated in the Option Agreement.

3. Owner has executed this Option Notice to give notice of the Option Agreement and certain rights and responsibilities of Owner as to the Beneficiary, as well as the covenants and promises set forth in the Option Agreement that run with the land and will be binding upon any party who acquires Owner's interest in the Property so long as the Option Agreement has not expired or been terminated.

TERMS

A. Notice. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement and this Option Notice, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement or this Option Notice is contained in the instrument conveying such interest in the Property to such person or entity.

B. Covenants. The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation:

1. restrictions on Owner's right to transfer the Property without giving prior written notice to the Beneficiary and requirements that Owner comply with specific sale

© 2022 Point Digital Finance, Inc 

procedures set forth in the Option Agreement;

2. requirements that Owner maintain insurance on the Property against certain hazards and risks;
3. restrictions on Owner's ability to increase the amount of debt to third parties secured by liens on the Property as specified in the Option Agreement;
4. requirements that Owner keep the Property free of liens not approved by Beneficiary; and
5. requirements that Owner protect and maintain the Property.

Option Agreement ID: 2022223-IVEVU

**Planned Unit Development Rider**

THIS PLANNED UNIT DEVELOPMENT RIDER is entered into as of July 28, 2022, and is incorporated into and shall be deemed to amend and supplement the Point Digital Finance Option Purchase Agreement that is entered into as of the same date by and between Tamara M. Katzenberger and Point Digital Finance, Inc., a Delaware corporation (the **"Option Agreement"**) with respect to that certain real property and improvements thereon commonly known as 3130 MEADOW LN, GRAND JUNCTION, CO 81504. **"We"**, **"us"**, **"our"** and **"Point"** refer to Point Digital Finance, Inc. and its successors and assigns. **"You"**, **"your"** and **"Owner"** refer to Tamara M. Katzenberger and Owner's heirs and permitted assigns under the Option Agreement. Capitalized terms used but not defined in this PUD Rider shall have the meanings set forth in the Option Agreement.

**Recital**

This PUD Rider is being entered into in connection with the Option Agreement because the Property (as defined below) is part of a planned unit development known as GROVE CREEK (the **"PUD"**). The Property also includes Owner's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the **"Association"**) and the uses, benefits and proceeds of Owner's interest.

**Agreement**

In addition to the covenants and agreements made in the Option Documents, Point and Owner further covenant and agree as follows:

**1. Definitions.** The following new or modified definitions shall apply to the PUD Rider and the Option Agreement:

**Agreement.** Shall be as defined in the Option Agreement and shall also include this PUD Rider.

**Governing Documents.** The governing documents of the PUD and the Association, including (a) declaration of covenants, conditions and restrictions or any other document that creates the PUD; (b) by-laws; (c) code of regulations; and (d) other equivalent documents, as each may be in effect from time to time.

**Option.** The Option means an exclusive and irrevocable option to purchase (a) an undivided percentage interest of fee simple title ownership in and to the Owner's parcel of land improved with a dwelling (**"Owner's Home"**), and (b) a right or easement to use any other parcels and common areas and facilities of the PUD as further described in the Governing Documents (the **"Common Elements"**).

**Option Documents.** Shall be as defined in the Option Agreement and shall also include this PUD Rider.

**Owner.** In the case of a Property that is part of a PUD, as of the Effective Date, an Owner shall be all of the persons or entities, individually and collectively, who appear on the record title to the Property as holding fee simple title to 100% of Owner's Home and the respective right or easement to use the Common Elements by virtue of being a member of the Association.

**Permitted Encumbrances.** Permitted Encumbrances shall be as defined in the Option Agreement and shall include easements, equitable servitudes, and other conditions, covenants, restrictions and rights to which the Property is subject at the time the Option Documents become



© 2022 Point Digital Finance, Inc.

effective.

**Property.** The Property shall be as defined in the Option Agreement and shall mean, collectively, Owner's Home and Owner's right or easement to use the Common Elements by virtue of being a member of the Association.

**2. Compliance with Governing Documents.** You agree to perform all of your obligations under the Governing Documents and to promptly pay, when due, all dues and assessments imposed pursuant to the Governing Documents.

**3. Option Grant Closing.** In addition to the items listed in the Option Agreement to be delivered as part of the Option Grant Closing, you shall deliver the following documents to escrow prior to or as part of the Option Grant Closing: Governing Documents.

**4. Property Insurance.** The insurance obligations that you have under the Option Agreement will be in addition to any insurance obligations or restrictions that you may have under the Governing Documents. In addition, you will have the following additional insurance obligations:

(a) You shall take such actions as may be reasonable to insure that the Association (i) maintains a public liability insurance policy, with a generally accepted insurance carrier, in the amount, and with extent of coverage as would be common for similar planned unit developments in similar locations to your PUD, and (ii) maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Common Elements which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, as would be common for similar planned unit developments in similar locations to your PUD.

(b) You shall give us prompt notice of any lapse in required property insurance coverage by the Association.

**5. Obligation to Provide Information to Point.** In addition to any other information that you are required to provide us under the Option Agreement, you shall promptly provide us (a) a copy of any notice of delinquency or similar document that you might receive from the Association to collect Association dues or assessments that you owe; (b) any notice to Owner that the Association intends to put a lien on Owner's Home for delinquent dues or assessment or other permitted reasons under the Governing Documents; (c) any amendments to or restatements of the Governing Documents; (d) notice of any vote taken by the members of the Association to terminate professional management of, and assume self-management of, the Association; or (e) notices of any legal proceedings affecting the PUD or the Association which have been delivered to you. Furthermore, you will promptly and accurately respond to requests for information received from Point during the Term, such as questionnaires regarding current Association dues.

**6. Preservation Payments.** The Preservation Payments payable under the Option Agreement shall include payments related to any late Association dues or assessments.

**7. Agreement to Subordination.** We agree to subordinate the priority of our rights under the Option Documents to any lien of the Association, provided that any requested subordination documents contain only reasonable and customary terms common to such agreements.



© 2022 Point Digital Finance, Inc.

**8. Repair and Restoration.** Section 4.4.1 (Repair and Restoration) of the Option Agreement shall be amended and restated in its entirety as set forth below:

If the Property is destroyed or damaged in any material manner, you shall restore or repair Owner's Home, and you shall take any other action to ensure that the Association restores and repairs the Common Elements, to at least the same condition and characteristics as of the time immediately preceding such destruction or damage, subject to all applicable local ordinances and the Governing Documents. Except to the extent you are required to take other action in connection with Senior Liens on the Property or pursuant to the Governing Documents, you shall apply any and all insurance proceeds (whether or not the underlying insurance was required by us and including any proceeds directed to you from the Association) to such restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair of Owner's Home, you shall be responsible for any shortfall. For the avoidance of doubt, you will not be responsible for any shortfalls resulting from the negligence, failure to act or malfeasance by the Association in applying insurance proceeds with respect to restoration or repair of the Common Elements. We shall have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

**9. Allocation Where Repair Not Feasible.** Section 4.4.2 (Allocation Where Repair Not Feasible) of the Option Agreement shall be amended and restated in its entirety as set forth below:

If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you shall obtain an Appraisal, provided that the appraiser shall be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any and all insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (a) to payment (or reimbursement) of reasonable costs and expenses (including, without limitation, attorneys' fees that have been approved by us) reasonably incurred by you, the Association, a senior lender and/or Point in collecting and contesting with the insurers the payments under the relevant insurance policies; (b) to payment of all Senior Loans, provided that, if the insurance proceeds equal or exceed the amount owed under such Senior Loans, such payment shall result in the discharge of the related Senior Liens; (c) to the Association as provided in the Governing Documents; (d) to us, an amount calculated according to the Calculation of Point Proceeds set forth in Schedule 2 of the Option Agreement; and (e) to you, the balance of the proceeds.

**10. Failure to Maintain Adequate Insurance.** Section 4.4.3 (Failure to Maintain Adequate Insurance) of the Option Agreement shall be amended and restated in its entirety as set forth below:

If (a) you fail to maintain insurance (excluding insurance to be carried by the Association) in amounts required by Section 4.1.1 of the Option Agreement, you fail to take actions required under Section 4 of the PUD Rider with respect to insurance to be carried by the Association, or any insurance claim is denied due to your action or inaction, and (b) the insurance proceeds from any loss are not sufficient to pay to us the entire amount owed as set forth in Section 4.4.2 of the Option Agreement, then there shall be an Exercise Payment Insurance Reduction proportional to the decrease in the Property's value as compared to the Appraised Value of the Property immediately prior to the destruction or damage. In this case, we may exercise the Option (if we have not already done so) and sell the Property in its then-current state according to the procedure set forth in Section 2.3 of the Option Agreement, except that the Exercise Payment shall be reduced because of the added economic burden and risk imposed on Point by virtue of your failure. The Exercise Payment Insurance Reduction shall be taken into account in the calculation of Point Proceeds. The proceeds of any sale pursuant to Section 4.4.3 of the Option Agreement, together with any and all available proceeds from any and all insurance policies (whether or not the underlying insurance was required by us or whether the insurance proceeds come from the



© 2022 Point Digital Finance, Inc. 

insurance maintained by the Association), will be allocated as described in Section 4.4.2 of the Option Agreement.

**11. Capacity; Authority**. The first two sentences of Section 5.2 (Capacity; Authority) of the Option Agreement shall be amended and restated in their entirety as set forth below:

You represent and warrant that you, as the Owner(s) identified above, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of Owner's Home and are a member of the Association (as defined in the PUD Rider) which gives you a right or easement to use the Common Elements of the Property. Other than as provided in the Governing Documents, your fee simple title to the Property is marketable and insurable, free of restrictions, leases, liens and other encumbrances or interests, and except as specifically identified in the Confirmation of Title delivered to Point, except with respect to Acknowledged Pre-Existing Liens and Approved Subsequent Liens.

**12. Documentation and Information Supplied by Owner; Financial Condition of Owner.** In addition to the documentation and information described in Section 5.6 of the Option Agreement, you are also required to supply to us any documents that you would be required to provide before a transfer of title or execution of a real property sales contract pursuant to the Governing Documents. Without limiting the foregoing, such documents and information shall include: (a) copy of the Governing Documents; (b) copy of the Association's legally-required, most recent financial statement, if applicable; (c) statement from authorized representative of the Association regarding any assessments; and (d) copy of any notices previously sent to you from the Association regarding any violation by you of the Governing Documents which remains unresolved.

**13. Conflict; Enforceability.** You represent and warrant that the execution and delivery of the Option Documents, the incurrence of the obligations set forth in the Option Documents, the consummation of the transactions contemplated by, or compliance with the terms of the Option Documents, will not conflict with, or result in a breach of, any of the terms, conditions or provisions of, or constitute a default under, the Governing Documents.

**14. Events of Default.** In addition to the Events of Default listed in Section 6.1 of the Option Agreement, each of the following shall constitute an Event of Default under the Option Documents, in Point's sole discretion: (a) failing to pay any Association due or assessment when due; (b) if the Association provides notice to you that it intends to put a lien on Owner's Home for delinquent dues or assessment of other permitted reasons under the Governing Documents; and (c) your material violation or breach of the Governing Documents.

**15. No Third-Party Beneficiaries.** For clarification purposes, the Association shall not be a third-party beneficiary of the Option Documents and the Association shall not have any rights or causes of action under the Option Documents.

**16. Point's Prior Consent.** You shall not, except after notice to us and with our prior written consent, consent to (a) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain or (b) termination of professional management and assumption of self-management of the Association.

**17. PUD Rider Controls.** In the event of any conflict between a provision of this PUD Rider and the Option Documents, the terms of this PUD Rider shall control.



© 2022 Point Digital Finance, Inc.

**[Signatures on Following Pages]**



© 2022 Point Digital Finance, Inc.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this PUD Rider as of the date first referenced above.

**OWNER:**

______________________ Date: 7/28/2022

Tamara M. Katzenberger



© 2022 Point Digital Finance, Inc.

Option Agreement ID: 2022223-IVEVU

## CONSENT OF SPOUSE

On July 28, 2022, Point Digital Finance, Inc., a Delaware corporation (**"Point"**), and Tamara M. Katzenberger (individually or collectively, **"Owner"**) entered into the foregoing Point Digital Finance Option Agreement (together with all exhibits, schedules, attachments and riders thereto, the **"Agreement"**) with respect to that certain property located at 3130 MEADOW LN, GRAND JUNCTION, CO 81504. Capitalized terms used but not defined in this consent have the meanings set forth in the Option Agreement.

I am the spouse // Civil Union Partner // Registered Domestic Partner (***circle one***) of Owner. I hereby acknowledge and certify that I have read and approve of the Agreement and the other Option Documents.

I am aware that the Option Documents contain provisions regarding the Property, including any interest I might have therein, and (a) the Owner's ownership rights in the Property, (b) requirements for use and care of the Property, (c) Point's rights to sell the Property in certain circumstances, and (d) Point's right to a portion of the sale proceeds of the Property. I am also aware that the Agreement obligates the Owner or the Owner's heirs, successors and assignees to pay the Point Proceeds (x) in the event of an Owner Option Repurchase, or (y) in the event of a Property Sale concurrent with or subsequent to Point exercising its Option.

I hereby agree that my interest, if any, in the Property shall be irrevocably bound by the Agreement. I further understand and agree that any community property interest (or similar interest based on the laws relating to marital property in effect in the state of our residence) that I may have in such Property shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am encouraged to seek independent professional guidance or counsel with respect to this consent and the Agreement. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.

Date: ____________________

______________________________
(Spouse Signature)

______________________________
(Print Spouse Name)



© 2022 Point Digital Finance, Inc

# ACKNOWLEDGMENT

State of Colorado )
) §
County of ________________________ )

The foregoing instrument was acknowledged before me this _______ day of

________________________________________,

by _________________________________________________________

_____________________________________________________________________________

_____________________________________________________________________________

Witness my hand and official seal.

__________________________________
(Signature of Notary) (Seal of Notary)

__________________________________
(Commission Expiration)



© 2022 Point Digital Finance, Inc 

## MORTGAGOR'S AFFIDAVIT

The term "Mortgagor" includes all homeowners, mortgagors, and trustors of the "Property." "Property" includes all of the real property included in the deed description for the Property Address identified below.

Mortgagor(s): Tamara M. Katzenberger
Property Address: 3130 MEADOW LN
City: GRAND JUNCTION
State: Colorado
Zip Code: 81504
Point Option ID:: 2022223-IVEVU
Investment Amount: $74,000.00
Investment Closing Date: July 28, 2022

BEFORE ME, the undersigned Notary Public in and for the State of personally appeared Tamara M. Katzenberger who, being first duly sworn, deposes and says:

1. That Mortgagor is the owner and in possession of that certain real property located in Mesa, Colorado, more fully described as: Please see attached legal description.

2. That there are no unrecorded contracts, deeds, mortgages, or other documents nor any facts which might be asserted, that could give rise to a lien interest in the Property.

3. That there are no parties other than the owner in possession of or claiming possession of the Property.

4. Mortgagor confirms that all bills for real estate taxes, special assessments for municipal improvements, water, sewer and other municipal fees are paid current through the Investment Closing Date or are not yet due and payable.

5. That for more than ninety (90) days prior to the date hereof, no material or labor has been furnished in connection with the improvements located on the Property for which any unpaid bills exist, that there are no unpaid mechanics' or materialmen's liens affecting the Property, and that all improvements on the Property have been paid for in full.

6. There is no action or proceeding against me, or relating to the Property, that is threatened or now pending before any state or federal court, agency or board, nor any state or federal judgment against me, nor any state or federal lien, which now constitutes or may become a lien, charge or encumbrance against the Property.

7. Mortgagor has not violated any covenants, conditions, or restrictions affecting the Property, or laws of any nature relating to environmental protection.

8. Mortgagor is not aware of the presence, use, disposal, storage, or release of any hazardous substances on the Property.

9. Mortgagor has not entered into any agreement or contract for conveyance, deed conveyance, written lease, or writing, whatsoever adversely affecting the title to said premises, except in connection with which this agreement is given.

10. Mortgagor has not applied for protection under bankruptcy statutes or any creditor's rights laws of any state.
    a. If Mortgagor has applied for protection under bankruptcy statutes or any creditor's rights laws of any state, those legal proceedings have been completely resolved in their entirety prior to the anticipated Investment Closing Date.

Mortgagor hereby acknowledges that:

1. This Mortgagor's Affidavit is being executed for the purpose of inducing Point Digital Finance, Inc. to make a Home Equity Investment and the Insurance Company to issue a Transaction Acknowledgement or Title Insurance Policy.

2. Both Point Digital Finance, Inc. and the Insurance Company will rely on the truthfulness of this Affidavit and the representations herein.

3. The information set forth herein is correct and complete. The Mortgagor hereby indemnifies Point Digital Finance, Inc. and the Insurance Company against all loss, damage, cost, and expense, including reasonable attorney's fees, incurred as a result of any inaccuracies contained in this Mortgagor's Affidavit.

_____________________________
Tamara M. Katzenberger

**ACKNOWLEDGMENT**

State of ~~Colorado~~ (DK) Oregon )
) §
County of Multnomah )

The foregoing instrument was acknowledged before me this 28th day of July, 2022,

by Tamara M. Katzenberger

Witness my hand and official seal.

(Signature of Notary)

12/2/2022

(Commission Expiration)

(Seal of Notary)

OFFICIAL STAMP
DONNA MARIA KISSANE
NOTARY PUBLIC - OREGON
COMMISSION NO. 981768
MY COMMISSION EXPIRES DECEMBER 02, 2022

## LEGAL DESCRIPTION

LOT 5 IN BLOCK 2 OF GROVE CREEK SUBDIVISION, FILING 3, COUNTY OF MESA, STATE OF COLORADO IN THE
COUNTY OF MESA AND STATE OF COLORADO.

APN: 2943-153-67-005

[end of legal description]

**Signature/Name Affidavit and AKA Statement**

Date: July 28, 2022 Point Reference: 2022223-IVEVU

Homeowner: Tamara M. Katzenberger

**THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW**: (This name and signature must exactly match the printed name and signatures on all Closing Documents.)

Tamara M. Katzenberger
Homeowner

Signature

**AKA Statement**

I, Tamara M. Katzenberger certify that I am also known as:

Tamara Marie Katzenberger

Sample Signature

# NOTICE OF RIGHT TO CANCEL

**Homeowner:** Tamara M. Katzenberger

**Property Address:** 3130 MEADOW LN
GRAND JUNCTION, CO 81504

**Option Agreement ID:** 2022223-IVEVU

## Your Right to Cancel

You are entering into a transaction that will result in a new security interest in your home. You have a legal right under Federal law to cancel this transaction, without cost, until midnight of the third business day after, whichever of the following events occurs last:

(1) the effective date of the transaction, which is July 28, 2022; or

(2) the date you received your Closing Disclosure; or

(3) the date you received this notice of your right to cancel.

If you cancel the transaction, the security interest is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the security interest in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

## How to Cancel

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Point Digital Finance, Inc.
Attn: Closing Department
444 High Street, 4th Floor
Palo Alto, CA 94301

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of August 1, 2022 (or midnight of the third business day following the latest of the events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective as to all borrowers.

## Cancellation Request

I wish to cancel this transaction.

____________________
Date

____________________
Homeowner Signature

## Acknowledgment of Receipt

Each of the undersigned hereby acknowledges receiving 2 copies of this notice on 7/28/2022

[signature] Tamara M. Katzenberger

7/28/2022
Date