**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| IN RE:<br><br>Tamara Marie Katzenberger,<br><br>Debtor. | Case No. 25-17421-MER<br><br>Chapter 13 |
| Tamara Marie Katzenberger,<br><br>Plaintiff,<br><br>v.<br><br>Point Digital Finance Inc., Point Digital Finance as Trustee for Point Titling Trust,<br><br>Defendants. | Adv. Proc. No. 26-01048-MER |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY THE ADVERSARY PROCEEDING**

Katzenberger has narrowed the issues. She does not dispute that she agreed to arbitrate, that Counts I through V fall within the arbitration clause, or that those claims should be arbitrated if TILA does not prohibit arbitration. The question is whether the Option created a debt that Katzenberger could defer paying.

Katzenberger says yes because Point paid her $74,000, expected eventually to receive money, and recorded a deed of trust. She asks rhetorically how Point could record "a security interest for $74,000" if there were no debt. *See* ECF No. 32 at 2.

She needn't look far for the answer. The very deed Katzenberger submitted says expressly: "Owner shall not be obligated to repay any part of the Option Investment Payment." ECF No. 32-1 at 46, § 2(b). And the same provision adds that the $74,000 Option Investment

Payment "shall not be included within the Obligations" secured by the deed. *Id.* Katzenberger's premise is backwards: the deed does not secure repayment of the $74,000; it expressly excludes that payment from the secured obligations.

Katzenberger's economic argument fares no better. She calculates that Point would rationally decline to exercise its option only if the Property's value fell below $170,591.76. ECF No. 32 at 8–9. The arithmetic is sound, but the inference is not. That figure identifies the threshold at which exercising the option ceases to have positive incremental value—not when Point begins losing its original $74,000 investment. Point begins losing that capital once the Ending Agreed Value falls below $277,220—the "Original Agreed Value." *See* ECF No. 32-1 at 5, § 1.1.

Katzenberger never confronts the CFPB's official interpretation of the statutory definition at issue. It identifies both "the execution of option contracts" and investment plans in which the investor risks losing the capital advanced as transactions that are not "credit." The Option has both features.

The Court should compel arbitration of Counts I through V and stay this proceeding.

**ARGUMENT**

Katzenberger contests only whether TILA bars arbitration. That question turns on whether the Option created "credit" under TILA. It did not. The operative documents impose no obligation to repay Point's $74,000, the transaction places Point's capital at risk, and the authorities Katzenberger cites do not establish otherwise.

## I. The deed expressly excludes repayment of the $74,000.

Katzenberger makes the deed the centerpiece of her TILA theory. But the very document she invokes as proof of debt says the opposite: Katzenberger had no obligation to repay the $74,000. Section 2(b) provides: "Owner shall not be obligated to repay any part of the Option Investment Payment . . . and therefore, such item shall not be included within the Obligations." ECF No. 32-1 at 46, § 2(b). The deed thus excludes the $74,000 payment from the secured obligations.

The surrounding provisions confirm § 2(b). The deed secures Point's rights under the Option, Katzenberger's performance of the Option Documents, Point Proceeds that turn on the value of Point's equity interest (if the option is exercised), and specified related obligations—not repayment of the Option Investment Payment. *See id.* at 43–46, §§ 1–2. Security does not establish that the transaction extended "credit." The question is whether the Option obligates Katzenberger to repay the $74,000 Point paid her. It does not.

## II. The Option's economics confirm it is an investment, not a loan.

The economics matter because Katzenberger argues that the 17% "risk adjustment" makes Point's $74,000 function like loan principal rather than capital at risk. Her own math shows otherwise.

Point paid $74,000 for the right—but not the obligation—to purchase a 69.4% ownership interest later. To exercise that right, Point must pay Katzenberger another $118,390.68, bringing its total investment to $192,390.68. *Id.* at 5–7, §§ 1.1, 1.4. Katzenberger focuses on the roughly $170,592 property value at which exercising the option (and obtaining a 69.4% ownership interest) would yield Point more in Point Proceeds than the cost of exercising the option. But that

would mean only that exercising the option would allow Point to receive more than the Exercise Payment; it would not necessarily return any of Point's original $74,000 investment.

For Point to recover its original $74,000 after paying the Exercise Payment, its 69.4% ownership share must be worth $192,390.68—the total amount Point will have paid. That occurs when the Ending Agreed Value is $277,220. Below that amount, Point loses part of its original $74,000 even though exercising might still make economic sense. The 17% adjustment therefore affects the price of Point's investment; it does not create a $74,000 principal balance or guarantee its repayment.

That distinction matters under TILA. As discussed below, the CFPB's official interpretation—which Katzenberger ignores—says that investments in which the party advancing capital risks losing it are not "credit." *See infra* § IV.

Katzenberger argues that Point would exercise the option even if it stood to lose money. ECF No. 32 at 8. But even if exercise were highly likely, that would not create a repayment obligation. The CFPB interpretation excludes "investment plans in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. pt. 1026, supp. I, cmt. 2(a)(14)-1.viii. It asks whether the capital is at risk, not whether a loss is likely. An investment does not become a loan because the investor expects to profit.

## III. Marketing terminology does not override the Option's operative terms.

Katzenberger emphasizes the "About My Point Agreement" disclosure, which uses "repay" and "repayment" repeatedly. ECF No. 32 at 4. But TILA asks whether Katzenberger incurred debt—not what terminology appeared in explanatory materials. The operative documents answer that question.

The same disclosure explains that Point "is buying the right to 69.4000% of my home's future change in value" and that "[t]his right is called the option." ECF No. 32-1 at 3. It describes a value-dependent option transaction, not an obligation to return $74,000. And the deed removes any ambiguity: Katzenberger "shall not be obligated to repay any part of the Option Investment Payment." *Id.* at 46, § 2(b). If Point does not exercise and Katzenberger does not repurchase, she pays Point nothing and retains the $74,000. *Id.* at 13, § 3.2.

The Quarterly Statement likewise undermines Katzenberger's characterization. It uses "payoff" and "repayment," but also states: "This is not a bill. There is nothing due at this time." ECF No. 32-2 at 3. And it adds: "This is not an attempt to collect a debt. No amount is currently due." *Id.* at 4. Its estimates describe the cost of "buying Point out"—a repurchase of Point's option rights, not repayment of principal.

Neither Point's use of RoundPoint Mortgage Servicing nor the Quarterly Statement's resemblance to a reverse-mortgage statement establishes a loan. ECF No. 32 at 4–5. Using a mortgage-servicing platform does not create a contractual obligation to repay the $74,000.

The same principle applies to Point's website statements, founder quotes, and investor communications. *See id.* at 5 (citing Compl. ¶¶ 15–41). A company's expected return on an investment is not the same as a borrower's contractual obligation to repay debt. TILA's definition turns on the contractual obligation created, not on how the company describes its business model to investors or in marketing.

The statutory question cannot turn on isolated nouns and verbs. "Credit" requires a right to defer payment of debt. 15 U.S.C. § 1602(f). The Tenth Circuit ties credit to an underlying debt, explaining that "[t]he credit granted and the debt owed are two sides of the same transaction." *Hasan v. Chase Bank USA, N.A.*, 880 F.3d 1217, 1219 (10th Cir. 2018). Here, there

is no debt owed. No contractual floor requires Katzenberger to return the $74,000. The Option may require payment to settle or repurchase Point's property rights, but it never requires repayment of the Option Investment Payment. Even for a remedial statute, the Tenth Circuit is clear: a court does not have "license to read into the statute something that isn't there." *Id.* at 1220.

## IV. The CFPB's interpretation and *Foster* confirm the Option is not credit.

The CFPB's official interpretation of Regulation Z confirms this analysis. Katzenberger ignores it.

The interpretation excludes from "credit" both "the execution of option contracts" and "investment plans in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. pt. 1026, supp. I, cmt. 2(a)(14)-1.vii–viii. The Option has both features: it is an option contract, and Point risks losing its capital. The interpretations deserve due respect as the considered construction of an Executive Branch agency charged with administering TILA. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402–03 (2024).

*Foster v. EquityKey Real Estate Investments, L.P.* reached the same conclusion on similar facts. There, a homeowner received a lump sum in exchange for an option on the home's appreciation; the court held the transaction was not "credit" under TILA because "there is no guarantee that the payment received . . . need ever be returned." No. 17-cv-00067, 2017 WL 1862527, at *4 (N.D. Cal. May 9, 2017). The same is true here: the Option Investment Payment need never be returned.

Katzenberger attempts to distinguish *Foster* based on the Point Proceeds formula, the 30-year term, and the sale/refinance/lien restrictions. ECF No. 32 at 7–8. But *Foster*'s holding turned on whether the homeowner was obligated to repay the initial payment—not on the

particular percentage formula or the option's duration. *See* 2017 WL 1862527, at *4. Here, as in *Foster*, the Option Investment Payment need never be returned. ECF No. 32-1 at 13, § 3.2; *id.* at 46, § 2(b). The Point Proceeds formula calculates the contingent value of Point's ownership interest—not a debt owed by Katzenberger. The 30-year term is the duration of Point's option right, not a maturity date for repayment of principal. And the sale, refinancing, and lien restrictions protect Point's rights in the Property; they do not obligate Katzenberger to repay the $74,000.

Because the Option is not "credit," it is not a "consumer credit transaction" and thus not a "residential mortgage loan" under 15 U.S.C. § 1602(dd)(5). It therefore falls outside TILA's arbitration bar. *Id.* § 1639c(e)(1).

## V. None of Katzenberger's authorities answers the TILA question presented here.

Katzenberger relies on *Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025), an unpublished, nonprecedential memorandum disposition whose judgment has been vacated. After settlement, the Ninth Circuit replaced its August 7 judgment with a judgment dismissing the appeal, leaving the district court's dismissal in place. *See* Order, *Olson v. Unison Agreement Corp.*, No. 23-2835 (9th Cir. Oct. 17, 2025).

In any case, *Olson* hardly provides persuasive support for Katzenberger's position. *Olson* interpreted Washington's lending statute, not TILA, and the court expressly refused to interpret Washington law "consistently with the TILA." *Olson*, 2025 WL 2254522, at *5. *Olson*'s state-law analysis does not answer the federal question here.

Nor did *Olson* involve a comparable obligation. Termination of the Unison agreement required paying "the *greater* of (1) the sum of Unison's initial $64,750 payment and any additional owner obligations that had accrued; or (2) the amount that Unison would obtain if the

house were to be sold at that time." *Id*. at *2 (emphasis added). Point's Option contains no comparable minimum. Nothing requires Katzenberger to return the $74,000 Option Investment Payment, and the Point Proceeds attributable to Point's ownership interest can fall below that amount or to zero.

Katzenberger also cites *Commonwealth v. Hometap Equity Partners, LLC*, No. 2584CV00469-BLS2, 2025 WL 2468564 (Mass. Super. Ct. Aug. 21, 2025). But *Hometap* was a Massachusetts state-law Rule 12(b)(6) ruling. The court held only that the Commonwealth had plausibly alleged that Hometap's product was a loan and that it was "premature to conclude one way or the other" whether that allegation was true. *Id.* at *7. That preliminary state-law ruling does not establish that this Option creates federal TILA "credit."

Katzenberger also relies on the Arizona trial court's ruling in *Muskal v. Point Digital Finance, Inc.*, No. CV2025-024855 (Ariz. Super. Ct. Dec. 17, 2025). The court initially announced its ruling in a cursory minute order and later entered a signed order. Point's appeal remains pending.

The ruling offers little guidance here. It states only that "the Court believes that the Truth in Lending Act prohibition against arbitration agreements would apply," without explaining how the agreement created "debt" under § 1602(f). And it involved a different transaction with materially different economics—a $210,000 initial payment and a 34.5% ownership percentage, compared with $74,000 and 69.4% here. Whatever persuasive force a state trial-court ruling that is still on appeal may have, it does not answer the dispositive question: whether Katzenberger was obligated to repay Point's $74,000. The deed says she was not.

## CONCLUSION

For these reasons, Point respectfully requests that the Court compel arbitration of Counts I through V and stay this adversary proceeding, including Count VI, pending completion of arbitration. Katzenberger does not oppose staying Count VI pending completion of arbitration.

Respectfully submitted,

MCGUIREWOODS LLP
*/s/ Jeffrey Paul Ehrlich*
Florida Bar No. 51561
MCGUIREWOODS LLP
888 16th Street, NW, Suite 500
Washington, DC 20006
Telephone: (202) 857-1717
Facsimile: (202) 857-1737
Email: jehrlich@mcguirewoods.com

MARKUS WILLIAMS LLC
Lacey S. Bryan #51908
1775 Sherman Street, Suite 1950
Denver, Colorado 80203-4505
Telephone (303) 830-0800
Facsimile (303) 830-0809
Email: lbryan@markuswilliams.com

*Counsel for Point Digital Finance, Inc., on behalf of itself and as Trustee for Point Titling Trust (erroneously sued as "Point Digital Finance as Trustee for Point Titling Trust")*

## CERTIFICATE OF SERVICE

I certify that I filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all registered participants.

Dated: September 3, 2026 */s/ Jeffrey Paul Ehrlich*